GEORGE S. HAZARD et al., Respondents, *v.* JOSIAH M. FISKE et al., Appellants.

Plaintiffs made advances to N. on pledge of the bill of lading of a cargo of corn, of which N. was general owner, and which was consigned to him at B. Upon arrival of the corn, plaintiffs consented that N. might designate the elevator in which it should be stored; this he did, and upon receiving from the master of the vessel the elevator receipt, instead of procuring a warehouse receipt in the names of plaintiffs, and delivering it to them, as according to usage it was his duty to do, he obtained such receipt in his own name. The plaintiffs knew that according to the usual course of dealing, the master would deliver the elevator receipt to the consignee on payment of freight, and that on such receipt a warehouse receipt would be issued to the consignee, or in the name of whom he should direct. They expected N. to pay the freight, and intended him to receive the elevator receipt. The corn arrived November 8th; plaintiffs paid no attention to its possession until November 18th, when they demanded repayment of their loan. Meanwhile, N. had shipped the corn to New York by canal, and on the faith of the canal boat bills of lading obtained advances from defendants. *Held*, that conceding plaintiffs' claim could not be enforced as against defendants, as to which *quære*, yet

it remained good as against N. or his creditors, and defendants would be entitled to protection against such claim only to the extent of their advances, and so far only as a lien on the corn or its proceeds was necessary to secure such advances ; and, it appearing that defendants had in their hands other funds belonging to N. upon which they had a lien for, and had the right to apply them to, the payment of these advances, and which after notice of plaintiffs' claim they paid over to another on the order of N. *Held,* that plaintiffs were entitled to demand, and upon refusal to pay, to maintain an action to recover the corn or its proceeds.

Also, *held,* that plaintiffs' right to have such other funds applied to cancel defendants' lien was superior to the title thereto of an assignee in bankruptcy of N., or to that of any person to whom N. might have assigned the same.

(Argued October 7, 1880 ; decided January 18, 1881.)

APPEAL from judgment of the General Term of the Supreme Court in the fourth judicial department, entered upon an order made on the second Tuesday of June, 1879, affirming a judgment in favor of plaintiffs entered upon a verdict and affirming an order denying a motion for a new trial. (Reported below, 18 Hun, 277.)

The nature of the action appears by the abstract of the complaint contained in the opinion.

It appeared in substance on the trial, that Ozias L. Nims, who (in copartnership with one David Long) was doing business under the name and style of " O. L. Nims, Agent," had directed one J. B. Lyon, who was their agent at Chicago, to purchase for the firm 24,000 bushels of corn, which Lyon did, and shipped the same on the schooner Czar on account of said Lyon to the care of Nims. To raise the money at Chicago to pay the purchase-price of the corn, Lyon drew his draft on Nims for $12,610.59, payable to the order of the cashier of a bank in Chicago and attached the same to the bill of lading issued by the master of the Czar. Lyon delivered the bill of lading, with the draft attached, to the said bank, which discounted it and sent the draft with the bill of lading forward to a bank at Buffalo for collection. The draft and bill of lading arrived at

Buffalo on the 30th day of October, 1871, and on that day the plaintiffs, also grain dealers at Buffalo, at the request of Nims and as a loan or advance on the cargo of the Czar, loaned to Nims $12,600, with the agreement that they should hold the bill of lading as collateral security for the repayment of the money, and took from Nims a receipt and agreement as follows:

· "BUFFALO, *October* 30, 1871.

"Received of G. S. Hazard & Co. twelve thousand and six hundred dollars, advance on 24,000 bushels corn — schooner Czar — bill of lading held as collateral.

"O. L. NIMS, *Agent*,

"per LEWIS M. EVANS."

At the time the receipt was given, the bill of lading was delivered to Hazard & Co., of which firm plaintiffs were the members, indorsed by "O. L. Nims," and by "O. L. Nims, Agent."

The schooner Czar arrived at Buffalo on the 7th or 8th of November following the transfer of the bill of lading.

According to the custom and ordinary course of business, the master of the schooner Czar would seek out the person to whose care the cargo was consigned, and deliver it to him or put it into such elevator as he should direct, and there was a custom among grain dealers at Buffalo, that when advances were made on a cargo of grain and the bill of lading assigned, the consignee would procure the elevator's warehouse receipt in the name of the person to whom the bill of lading was assigned, and the assignee generally intrusted the performance of that duty to the general owner of the grain, though in some instances those who had made advances on cargoes gave notice to the proprietors of the elevator that the warehouse receipt must be made out to the party to whom the bill of lading was assigned. In this instance, the master, having notified Nims of the arrival of the cargo, was directed by the latter, with the assent of the plaintiffs, to deliver the cargo into an elevator known as the "City Elevator," and he did so, taking a ware-

house receipt known as an "elevator ticket" for the same. The master then took the "elevator ticket" to the office of the "Western Elevating Company" who then had charge of the running of several elevators in Buffalo, and procured the warehouse receipt of that Company for the said cargo of corn, upon the indorsement and delivery to it of the "elevator ticket," which warehouse receipt certified that said company had received said cargo in store subject to the order of O. L. Nims. This warehouse receipt the master took to the office of O. L. Nims and delivered to him on being paid his freight.

By some neglect or inadvertence the plaintiffs never got possession of the warehouse receipt, and Nims, without the consent or knowledge of the plaintiffs, caused the corn to be shipped on four canal boats, after mixing it with other corn belonging to him, consigned to the defendants constituting the firm of J. M. Fiske & Co., commission grain dealers in New York, and obtained from the master of each of said canal boats a canal shipping bill or bill of lading, consigning the corn embraced in that cargo to the care of said firm at New York, and drew his draft on the firm against each of the said canal cargoes, attached the draft in each case to the canal shipping bill and procured the several drafts to be discounted at some one of the Buffalo banks. The said several drafts were sent to New York for collection and were presented to and paid by said J. M. Fiske & Co. without any notice of any claim of plaintiffs to the corn.

The further material facts are set forth in the opinion.

*William H. Greene* for appellants. The rule at common law, "That whenever one of two innocent persons must suffer by the act of the third, he who enabled the third person to do or occasion the injury or commit the fraud, if it be one, must sustain the loss," is applicable to this case. (*Dows* v. *Green*, 24 N. Y. 638; *Voorhis* v. *Olmstead*, 66 id. 113, 117.) Plaintiffs lost their lien under the statute of frauds as against the defendants, *bona fide* purchasers. The plaintiffs' lien depended on their keeping their possession from Nims, as between them

and *bona fide* purchasers. (2 R. S. p. 135, § 5; *Kyser* v. *Harbeck*, 3 Duer, 373, 390, 392; *Rowley* v. *Bigelow*, 12 Pick, 307; *Morey* v. *Walsh*, 8 Cow. 238; *Root* v. *French*, 13 Wend. 572; *Evans* v. *Salters*, 12 Pick. 306; *Stevens* v. *Hyde*, 32 Barb. 572.) Defendants' title is good as against the plaintiffs by force of the "Factor's Act," first section. (Laws of 1830, chap. 179, p. 203; *Dows* v. *Greene*, 24 N. Y. 638; 32 Barb. 490; 60 N. Y. 40, 47.) The third section of the "Factor's Act" protects the defendants as *bona fide* purchasers. (*Bates* v. *Cunningham*, 19 N. Y. Sup. Ct.; 12 Hun, 412; *Howland* v. *Woodruff*, 60 N. Y. 74; *Pegram* v. *Carson*, 10 Bosw. 505.) As soon as the master delivered the cargo to Nims, the appointed agent, in the usual way of business, his possession was at an end and the bill of lading became a worthless piece of paper, both by law and in fact, so far as it any longer represented or symbolized the possession of the cargo. (*Morgenstein* v. *Barber*, 2 C. P. 38–45; *Farmers' Nat. Bk. of C.*, 57 N. Y. 37; 2 Kent's Com. 549.) The plaintiffs have proved no lien or title as against the defendants. (57 N. Y. 28.)

*Sherman S. Rogers* for respondents. Plaintiffs established in themselves a special property in the grain to the extent of the advances made by them. (*Marine Bank* v. *Fiske*, 71 N. Y. 353; 9 Hun, 363; *Man. & Tr. Bank* v. *Farmers & Mechanics' Bank*, 60 N. Y. 40; *First Nat. Bank of Toledo* v. *Shaw*, 61 id. 283; *City Bank of R.* v. *Jones*, 4 Comst. 497; *First Nat. Bank of C.* v. *Kelly*, 57 N. Y. 34; *City Bank of Rome* v. *R. & W. R. R.*, 44 id. 136; *Dows* v. *Nat. Ex. Bank of M.*, 91 U. S. 618.) The tortious shipment of grain by a party gives no protection to a consignee or other party advancing or buying on the strength of the bill of lading. (*Covill* v. *Hill*, 2 Seld. 374; *S. C.*, 4 Den. 323; 1 Comst. 522; *Man. & Tr. Bank* v. *Farmers & Mechanics' Nat. Bank*, 60 N. Y. 40, 52; *Wilson* v. *Nason*, 4 Bosw. 155; *Blossom* v. *Champion*, 37 Barb. 554; *Saltus* v. *Everett*, 20 Wend. 567; *Barnard* v. *Campbell*, 55 N. Y. 456; 58 id. 76; *First Nat. Bank of T.* v. *Shaw*, 61 id. 283; *Marine Bank* v. *Fiske*, 71

id. 353.) The actual possession of property is not sufficient to protect a purchaser from the party in possession as against the true owner. (*Ballard* v. *Burgett*, 40 N. Y. 314; *Spaights* v. *Hawley*, 36 id. 441; *Austin* v. *Dye*, 46 id. 500; *Cook* v. *Adams*, 1 Bosw. 155; *Weaver* v. *Barden*, 49 N. Y. 287; *McGoldrick* v. *Willett*, 52 id. 612; *Dows* v. *Perrin*, 16 N. Y. 325, and c. c.; *F. & M. Nat. Bank* v. *Logan*, 74 N. Y. 568.) The interest of the plaintiffs was not that of a mortgagee, but of a pledgee or special owner of the grain. (*Bank of R.* v. *Jones*, 4 Comst. 507; *First Nat. Bank of Toledo* v. *Shaw*, 61 N. Y. 283; *City Bank* v. *Rome, W. & C. R. R.*, 44 id. 136; *Cayuga Co. Bank* v. *Daniels*, 47 id. 632; *Dows* v. *Nat. Ex. Bank*, 91 U. S. Sup. Ct. 618.) Nothing was done by the plaintiffs to divest their lien, if their interest be held to be that of pledgees. (*Hayes* v. *Riddle*, 1 Sandf. Sup. Ct. 248; Story on Bailment, §§ 58, 299; *Macomber* v. *Parker*, 4 Pick. 497; *Thayer* v. *Dwight*, 104 Mass. 254; *Marvin* v. *Wallace*, 6 Ellis & Black. 726; *Dows* v. *Nat. Ex. Bank*, 91 U. S. 618.) Against a tortious retaking of possession by a mortgagor, the mortgagee is not bound to file. (*First Nat. Bank of C.* v. *Kelly*, 57 N. Y. 34.)

RAPALLO, J. A large portion of the argument on the part of the appellants is devoted to maintaining the position that when the schooner Czar arrived at Buffalo, O. L. Nims took the 24,000 bushels of corn, which were by the bill of lading consigned to him, into his possession, and with the consent of the plaintiffs stored them in the city elevator and took out the warehouse receipts in his own name; and that he also, with their consent, shipped the corn, in his own name in the canal boats. Had these facts been clearly established there can be no doubt that the defendants, by making advances to Nims in good faith on the credit of the canal boat bills of lading, would have acquired a valid lien upon the corn, as against the plaintiffs. (*Voorhis* v. *Olmstead*, 66 N. Y. 113.) Nims is admitted in the case to have been the general owner, the plaintiffs claiming only a lien thereon for their advance, and if they volun-

tarily placed Nims in possession of the corn, their alleged lien could not be enforced against a *bona fide* purchaser or pledgee of Nims. To retain their lien it was necessary that they should retain the possession. Furthermore the defendants would have been clearly within the protection of the Factors' Act.

But it is by no means a conceded fact in the case that the plaintiffs did intrust Nims with the possession of the corn, or consent to his taking out the warehouse receipts in his own name, or to his shipping the corn on board the canal boats in his own name. If they had done either of these things no custom of the city of Buffalo could have sustained their lien as against the defendants, who were subsequent *bona fide* pledgees of Nims. But the plaintiffs contend that all that they consented to was that Nims might designate the elevator in which the corn should be stored, and that when it was received there, and the master of the schooner delivered to him the elevator receipt, it was his duty, according to the usage, to obtain a warehouse receipt in the name of the plaintiffs and deliver it to them. That this was consequently the implied understanding between the parties, and the plaintiffs never intended to intrust Nims with the possession and control of the corn. That it was a fraud upon them to take out the warehouse receipt in his own name and that it was only through inadvertence that they omitted to obtain from him the proper receipt, they supposing that they had done so. There was evidence to sustain this theory, and also to show that he concealed from them the fact of his shipping the corn on the canal boats.

The charge of the court is not printed in the case and we cannot, therefore, know what questions were submitted to the jury. We must, however, assume, in support of the judgment, that the questions whether the plaintiffs voluntarily intrusted Nims with the possession of the corn or consented to his taking the warehouse receipt in his own name were submitted to the jury and passed upon by them adversely to the defendants' claim, and we must, therefore, examine the case as it stands upon the uncontroverted facts.

These present questions of considerable difficulty. Nims is

admitted to have been the general owner of the corn. So long as it remained on board the Czar, the plaintiffs by reason of the indorsement to them of the bill of lading were in possession as pledgees. But when the cargo had been discharged into the elevator, the effect of the bill of lading ceased. The possession then became vested in the party taking out the warehouse receipt. If Nims, having undertaken to take out a receipt in the names of the plaintiffs, fraudulently took one out in his own name, this was a conversion of the grain by Nims, for which the plaintiffs could have maintained an action against him, or they could have treated Nims as their agent, and asserted their title and right of possession against him and his bailee. But in respect to third parties who may have dealt with Nims on the strength of his possession and apparent right, different questions arise, and it must be considered how far the acts of the plaintiffs, or even their omissions, may have affected their rights.

On this branch of the case the plaintiffs plant themselves upon the general rule of law that the purchaser of personal property takes only such title as the seller has to convey, or is authorized to transfer, and that the mere possession of the seller is not such evidence of title in him as will protect one taking from him, against the true owner, even though the possession may have been intrusted to the seller by the true owner.

This rule is not, however, applicable in its full extent to the present case. It must be remembered that Nims was the owner, and the plaintiffs had only a lien for their advance. If the plaintiffs had been the general owners, the possession of Nims, whether acquired fraudulently or with the consent of plaintiffs, would have afforded no protection to the defendants. But the plaintiffs being merely pledgees, if they permitted the pledgor and general owner to assume the possession and control of the corn, and voluntarily placed him in a position which enabled him to invest himself with the *indicia* of title, it is a serious question how far they may have disabled themselves from asserting their lien against a subsequent *bona fide* purchaser or

pledgee from him, although it might continue as against Nims or his creditors.

In its facts this case differs in some respects from those which have been before us on previous occasions, arising out of the transactions of Nims and other parties in Buffalo.

Nims was, by the lake bill of lading, consignee of the corn. This the plaintiffs knew; and they also knew, as testified to by them, that by the usual course of dealing the master of the Czar, which had the grain on board, would discharge the cargo at whatever elevator the consignee directed, and would take the elevator receipt and deliver it to the consignee on payment of the freight, and that on that receipt a warehouse receipt would be issued to the consignee, or in the name of whomever he should direct. When the vessel arrived at Buffalo they asked Nims in what elevator he intended to store the corn, and he told them the city elevator. They expected him to pay the freight, and, consequently, intended that he should receive the elevator receipt from the master and that he should thereupon obtain a warehouse receipt. The elevator receipt was the voucher upon which the warehouse receipt was issuable, and it is plain that they intended that this voucher should come into his hands, and they knew that this would place it in his power to take the warehouse receipt in his own name. They say that, according to the custom, he should have taken the warehouse receipt in their names and delivered it to them, but nothing appears to have been said upon the subject, nor does it appear that they ever asked him for it, though they say they supposed they had it, until, on looking for it after his failure, they ascertained that they did not have it. They testify that they could have protected themselves by giving notice of their lien to the elevator association and requiring that the receipt should be issued to them, but that nothing of the kind was done. The witnesses who testify to the custom of intrusting the taking out of the warehouse receipt to the pledgor under such circumstances, also testify that some lenders were in the habit of giving notice of their lien to the elevator and seeing that the warehouse receipt was issued in their names, and that it

was usual to do so when there was any want of confidence in the pledgor ; when, as they express themselves, he was at all shaky. The plaintiffs appear to have paid no attention to the matter of the possession of the corn, from the time of the arrival of the Czar at Buffalo, November 8, 1871, until November 18, 1871, when they demanded of Nims repayment of their loan. In the meantime Nims, by reason of the possession which he had thus acquired, was enabled to ship the corn to New York and obtain from the defendants the advance which they made on the faith of the canal boat bills of lading.

There is much force in the argument that the plaintiffs had, either negligently or through their confidence in Nims, permitted him to take possession of the corn, and that they had lost their lien as against his subsequent *bona fide* pledgees without notice of the rights of the plaintiffs. But there is another point in the case which relieves us of the necessity of deciding that question. Assuming that the defendants are right in their claim that the plaintiffs' lien could not be enforced as against theirs, yet it remained good as against Nims or his creditors. The defendants would be entitled to protection against the plaintiffs' claim, only to the extent of the defendants' advances to Nims, and so far only as a lien on the corn or its proceeds was necessary to the security of their advances. If Nims repaid these advances, the plaintiffs would be justly entitled to demand of the defendants the corn, or its proceeds. The same result would follow if the defendants had in their hands other funds of Nims, which they had the right to apply to the payment of these advances, and instead of so applying them they paid them over to Nims or on his order after notice of the rights of the plaintiffs. The complaint alleges that the defendants sold the corn which was pledged to them by Nims, and that the net proceeds of the sale amounted to about $11,605, but that the defendants had in their hands other property, money and securities, which they were entitled to apply to the reimbursement of their advances to Nims, and which, as between plaintiffs and defendants, ought to have been so applied. It appeared in evidence that there

were large dealings between the defendants and Nims prior to and at the time of the transaction now in question, which consisted of shipments of grain made by Nims to the defendants, for sale, on which shipments advances were made as in the present case. That these dealings were had under an agreement by which the defendants had a general lien on any balance in their hands, for any amount due them from Nims. Consequently if they had a general balance in their hands belonging to Nims, sufficient to repay the advances made on the corn now in question, and the plaintiffs had a right as against Nims to that corn or its proceeds, the defendants, after receiving notice of the plaintiffs' rights, could and should have resorted, in the first instance, to such general balance for their reimbursement, instead of resorting to the fund to which the plaintiffs were equitably entitled. It appears that on the 23d of November, 1871, immediately after the failure of Nims and the discovery that he had shipped to the defendants the corn pledged to the plaintiffs, the plaintiffs, by letter, gave notice to the defendants that the corn in question belonged to the plaintiffs, and had been shipped by Nims without their consent or authority, and that they held the defendants responsible for the corn, and requested them to hold it subject to the order of the plaintiffs. This was sufficient to require the defendants to inquire into the rights of the plaintiffs, and render them accountable to the plaintiffs for the corn, except to the extent which was necessary for their own protection.

But it was proven on the trial that at the time that notice was received, the defendants had in their hands property of Nims, consisting of consignments of grain, from which they subsequently realized a balance of more than $35,000 over and above all advances, etc., on which balance, under their agreement before mentioned, they had a lien for any amount due them from Nims.

This was much more than sufficient to enable them to reimburse themselves their advance upon the corn in controversy, without resorting to that corn or its proceeds, and it was clearly their duty to respect the rights of the plaintiffs by re-

taining those advances out of this general balance, and thus exonerate the proceeds of the corn pledged to the plaintiffs; but instead of so doing, they paid over this sum of $35,000 and upwards, in May and June, 1873, to John M. Hutchinson, upon an order in his favor given him by Nims, on the 15th November, 1871, for the amount of the surplus of his consignment to the defendants, after repaying to themselves their advances thereon. In these consignments were included those of the corn on which the plaintiffs had advanced, and on making this payment the defendants took a bond of indemnity from Hutchinson.

We are of opinion that after having received notice of the plaintiffs' rights, and after having ascertained that they had a fund belonging to Nims sufficient to repay all their advances, and subject to a lien therefor, without resorting to the proceeds of the plaintiffs' corn, the defendants should be deemed to have held those proceeds to the use of the plaintiffs, and that the payment of them to Hutchinson was in their own wrong.

The only answers made by the appellants to this point are first, that the plaintiffs cannot recover in this action for the proceeds of the corn as money had and received to the plaintiffs' use, but only as an action of tort for the conversion of the corn; and secondly, that if the defendants had no demand of their own against Nims, for which they had a lien upon the proceeds, the money would belong to the assignee in bankruptcy of Nims, or to John M. Hutchinson, in whose favor the draft of November 15, 1871, was drawn.

In respect to the right of the plaintiffs to recover the proceeds of the corn in this action, it appears that the complaint is framed with the express view of reaching them. It sets out the plaintiffs' lien upon the corn, its shipment, without their authority, to the defendants, and notice from the plaintiffs to the defendants of the plaintiffs' claim to the corn. It then avers the sale by the defendants, and their receipt of the proceeds, and also the claim of the defendants that it was lawfully sold by them by virtue of a transfer to them to secure certain advances to Nims, and that they were entitled to apply the

proceeds so far as necessary to the reimbursement of such advances, and then proceeds to aver that the defendants had in their hands other property, money and securities which they were entitled to apply to the reimbursement of their advances to Nims, and which as between the plaintiffs and defendants, the plaintiffs ought so to have applied, and, therefore, the proceeds of the corn were received to the use of the plaintiffs.

The plaintiffs then allege that, not knowing whether in fact their grain was lawfully sold by the defendants, they have demanded the proceeds, etc.

It seems to us that this action is rather in the nature of an equitable action to reach those proceeds than an action for a conversion of the grain. It would be difficult under the allegations of the complaint to maintain it as an action of tort. The plaintiffs do not aver a wrongful conversion by the defendants, but ignore the question whether or not the corn was lawfully sold by them.

The second ground taken by the appellants is equally untenable. The plaintiffs were clearly entitled as between them and Nims to the corn or its proceeds. Their title was superior to that of any creditor or assignee in bankruptcy of Nims, or to that of any person in whose favor Nims might draw for such proceeds, or to whom he might assign them; all such transferees took subject to the prior equities of the plaintiffs. No one but the defendants appear to have been in a position to dispute the equities of the plaintiffs, and their right to do so existed to the extent only which was necessary to secure the payment of the advances which they had made on the strength of the apparent possession and title of Nims. If they could reimburse themselves from other money of Nims in their hands, after notice of the plaintiffs' rights, equity clearly required them to do so.

The judgment should be affirmed.

All concur.

Judgment affirmed.