William Nelson Cromwell, Referee.
This is an action brought by the plaintiffs. The English Bank of Rio de Janeiro, Ld., German Bank of London, Ld., ’ London and Brazilian Bank, Ld., all banking corporations organized and existing under the laws of the Kingdom of Great Britain, and Messrs. Morton, Bliss & Co., a banking house of the City of New York, to recover the proceeds of the sale of 3,032 bags of coffee. The defendants are J. M. Edwards & Co., who sold the coffee in question; Thomas T. Barr, their assignee for the benefit of their creditors, and the Bank of America, with whom the larger part of the proceeds of said coffee are on deposit. The cause of action arises out of the following facts:
The case has been fully and carefully presented before me and from the testimony I find and conclude as follows :
In February, 1887, the firm of J. M. Edwards & Co., doing busines in the City of New York, applied to the several plaintiffs for letters of credit, and in that month the English Bank of Rio de Janeiro, the German Bank of London, and the Brazilian Bank issued to the said firm their several letters of credit, each for £25,000, and the firm of Morton, Bliss & Co. their letter of credit for ;£ 15,000. At the time of issuing these letters of credit, the plaintiffs each received from the firm of Edwards & Co. a letter of advice or contract, setting forth the terms upon which the credit was granted. These letters or contracts of the several *9 , .plaintiffs are similar in form. The following is a copy of the letter of credit issued by the English Bank of Rio de Janeiro :
New York, February 23, 1887.
“No. 838.
“ Christian R. Hopkins, Esq., or his appointees, Rio de Janeiro and Santos, are hereby authorized to value upon the English Bank of Rio de Janeiro, Limited, in London, at ninety days’ sight for account of Messrs. J. M. Edwards •& Co., NewYork, for any sum or sums not exceeding in all twenty-five thousand pounds sterling for the cost of coffee to be shipped from Rio and Santos to ports of United .States on board any vessel or vessels.
“ The bill of lading must be made out to the order of the English Bank of Rio de Janeiro, Limited, and one of •such bills of lading must be forwarded direct to Charles M. Fry, Esq., the bank’s attorney in New York, by the ship taking the coffee drawn against, together with invoice properly certified.
“ The shipments must be completed and the bills of exchange drawn and negotiated within six months from this date, the drawings of the bills must be advised to the drawees in original and duplicate, such advice being accompanied by bills of lading with abstract of invoice endorsed thereon, and the bills must contain the clause ‘ against Letter of Credit No. 838, dated New York, Feby. 23, 1887.’
“ And we hereby agree with the drawers, endorsers and bona fide holders of bills not exceeding the total amount of ^25,000 drawn in compliance with the terms of this credit, that the same shall be duly honored on presentation at this bank in London.
“ For English Bank of Rio de Janeiro,
“ Limited,
“ (Sd.) Chas. M. Fry,
“ Attorney.
“ N. B. Please let a note of every bill be endorsed hereon at the time of drawing.”
*10 At the same time Edwards & Co. signed and delivered to the bank the following agreement:
“ New York, February 23, 1887.
“The English Bank of Rio de Janeiro, Limited,
“ London.
“ Gentlemen :—Having received from you the letter of credit, of which the annexed is a copy, for twenty-five thousand pounds sterling (the terms and conditions of which we confirm), we hereby agree in consideration thereof, that we will on receiving from Charles M. Fry, Esq., your attorney at New York, the property shipped under the credit or the bills of lading thereof, give him such security as he shall demand, and in any case we bind ourselves to place your bank in London, previously to the maturity of the bills that may be drawn under the credit, in possession of sufficient funds in cash or in bankers’ bills of exchange, at not exceeding sixty days’ sight, endorsed by us and approved of by your said attorney, to meet the payment of the said bills, together with a commission of three-fourth per cent, and any interest which may accrue thereon, calculated at the rate of five per cent, per annum, or at the Bank of England minimum, if above that rate. And we hereby give you, a specific charge and lien on all goods and the proceeds thereof, for which your bank may come under any engagements under the said credit, on all policies of insurance on such goods, and on all bills of lading given therefor as collateral security for the payment as above promised, and for' the payment of all other sums that may be, or become due by us to your bank, growing out of any other credits, and they are and shall be held subject to the order of your-bank on demand, with authority to take possession and dispose of the same at discretion, by public sale or otherwise on our account and risk for its security or reimbursement, and to charge all expenses including commissions for sale and guarantee, the bank being free from *11 all responsibility whatever in respect of such sale, and we agree to give any additional security that may be demanded. We further agree to place the insurance .policy or policies covering all merchandise, shipped under the annexed credit, in the hands of your bank in London, or of your attorney in New York; loss, if any, payable to your bank direct, or to your said attorney.
“ We undertake all risks of the acts of the users of this Letter of Credit, and agree that the bank shall hold the delivery to it of the documents named therein, as sufficient evidence of the good faith of the shippers, without assuming any further responsibility in regard to the shipment. We further undertake all risk of error or delay in the transmission of telegrams that may be sent by our order in connection therewith.
“ This obligation is to continue in force and to be applicable to all transactions, notwithstanding any change in the individuals comprising our firm, or that of the user of this Credit, whether such change shall arise from the accession of one or more new partners, or from the-death or secession of any. partner or partners.
“(Sd.) J. M. Edwards & Co.”
Pursuant to the terms of these credits, the several plaintiffs accepted for account of Edwards & Co. certain drafts upon them by Edwards & Co., against shipments of coffee consigned to New York to the order of the several plaintiffs ; the bills of lading for the coffee were issued to plaintiffs and delivered to them respectively at the time of acceptance of said drafts.
In this manner upon the receipt of the respective bills of lading, the English Bank of Rio de Janeiro accepted a draft for £2,319 4s. 3d. drawn against a shipment of 495 bags of coffee ; the German Bank accepted a draft of ¿£4,618 2s. against a shipment of 1,000 bags; and the London and Brazilian Bank accepted a draft of ¿£493 5s. 4d. against a shipment of 1,048 bags of coffee ; and the firm *12 ■of Morton, Bliss & Co. accepted a draft of £2,409 /s. iod. against a shipment of 547 bags of coffee.
The coffee was, as stated, in each instance consigned to the plaintiffs, and the bills of lading were made out in their names respectively and actually received by them before the acceptance of said drafts.
After such consignment to them and the- delivery of the said several bills of lading, the plaintiffs severally upon the application of them, at the city of New York, by the ■firm of Edwards & Co., endorsed over and delivered to said ■firm said bills of lading upon receipt of what is -known in banking circles as trust receipts. The trust receipt in ■each of said cases is substantially alike in form. The one received b'y the English Bank of Rio de Janeiro is as "follows:
“ New York, June 20, 1887.
“ Property in Trust:
“ Received of the English Bank of Rio de Janeiro, .Limited, through its correspondent, Charles M. Fry, Esq., the merchandise specified in the bill of lading per 1 LasselL’
“ Four hundred and ninety-five bags of coffee which we agreed to hold in storage as the property of the bank with liberty to sell the same and to account for the proceeds to its said correspondent until all bills of exchange drawn for our account on the said bank shall have been paid or satisfactorily' provided for, to keep said property insured against fire, payable in case of loss to the correspondent of the bank for its account, with the understanding that the bank is not to be chargeable with any expenses incurred thereon, the intention of this arrangement being to protect and preserve unimpaired the lien of the English Bank of Rio de Janeiro, Limited, on said property.
“ (Signed) J. M. EDWARDS & Co.”
Upon receipt of the bills of lading, Edwards & Co. passed the coffee through the Custom House, stored it in a *13 storage warehouse, taking negotiable receipts therefor in their own name, and thereafter sold 3,022 bags of the-same at one sale on June 29, 1887, to Messrs. Arbuckle Bros., of New York City, for the sum of $63,336.91.
On account of the purchase price of said sale, Messrs. Arbuckle Bros, paid to Edwards & Co. on said day their check for $61,500. This check Edwards & Co. then endorsed and deposited to their credit with the Bank of America, one of the defendants herein, the following day.
Edwards & Co. had never kept an account with the Bank of America, and on that day, June 30, 1887, opened an account with that bank, though at the time of the deposit of Arbuckle’s check, they made some other deposits,, swelling the total sum so deposited to $71,803.82.
On the same date, and after the making of said deposit, J. M. Edwards & Co., made a general assignment to the defendant, Thomas T. Barr, for the benefit of their creditors, under the statutes of this State.
No drafts were made upon said fund, nor were other additions made thereto, and it remained intact until the said assignment, with the single exception that Edwards & Co. drew a check for $1,000 against their said account with the bank, and that check was paid. After that date- and before the commencement of this action, the balance of said account was changed to the credit of the assignee, and now so stands on the books of said bank, viz., $70,803.82.
The balance of the purchase money of the coffee was paid by Messrs. Arbuckle Bros., to the assignee, viz., $1,485. This action is brought to recover the proceeds of the sale so on deposit with the Bank of America out of the said balance so paid over to and now held by the said assignee.
It is claimed by the plaintiffs, that the legal title to the coffee was vested in them as owner ; that the surrender of the bills of lading to Edwards & Co., upon receiving-the trust certificate did not divest them, the plaintiffs, of' *14 their legal title, but was simply an authorization to Edwards & Co. to sell, which though it might protect an innocent purchaser for value, would not avail an assignee for the benefit of creditors, and would not preclude the ■plaintiffs from following the proceeds of any sale so long ■as the same could be identified in the hands of one who has not parted with value therefor.
It is contended, on the other hand, by the defendants that although by the wording of the trust receipt, Edwards & Co. were to retain the coffee in trust for the plaintiffs, with liberty to sell, but in case of sale to account for the proceeds, nevertheless it had been the custom of the parties not to require a literal performance of this agreement ; that Edwards & Co. had been required merely to provide for the drafts at their maturity ; that this was the general custom in the trade, also, and that it was within the contemplation of the parties at the time of the signing of the so-called “ trust receipt ” which, therefore, created no trust, but was simply an agreement to pay ■certain drafts at their maturity.
It is of prime importance at the outset to discover who were the legal owners of the coffee. It is my judgment that under the very recent decisions in this State (Farmers’ & Mechanics’ National Bank v. Logan, 74 N. Y. 568, 573 ; Dows v. Kidder, 84 Id. 121; Moors v. Kidder, 106 Id. 32, and Drexel v. Pease, Daily Register, Oct. 10, 1887; Hazard v. Fisk, 83 N. Y. 287), the several plaintiffs were the general owners^—not the mere pledgees—of the coffee in question. The doctrine of these cases is well stated by Finch, J., in Moors v. Kidder (supra) where he says :
“ Where a commercial correspondent however set in motion by a principal for whom he acts, advances his own money or credit for the purchase of property and takes the bill of lading in his own name, looking to such property as the reliable and safe means of reimbursement up to the moment when the original principal shall pay *15 the purchase price, he becomes the owner of the property instead of the pledgee, and his relation to the original mover in the transaction is that of an owner under a contract to sell and deliver when the purchase price is paid.”
All the circumstances that existed in the Moors case on that point are present in this case. The plaintiffs •advanced their credit and money for the purchase of the coffee, and they took the bills of lading in their own name, looking to the coffee for reimbursement, rather than relying upon Edwards & Co.’s personal responsibility. They were thus the general owners of the coffee, under contract, however, to sell and deliver the coffee to Edwards & Co., or their appointees, upon repayment of their advances.
Being such general owners of the coffee, the plaintiffs ■delivered the possession thereof to Edwards & Co. under a contract, termed a trust receipt, wherein Edwards & Co. agreed to hold the goods in trust for the plaintiffs, with leave to sell them, but in case of such sale, to account for • the proceeds. Leaving out of consideration for the present any custom which defendants sought to prove, the ■effect of putting Edwards & Co. in possession under this trust receipt, was not to divest the plaintiffs of their title to the goods. It might fairly be claimed that any bona fide purchaser of the coffee from Edwards & Co., for value and without notice, could hold the coffee as against the plaintiffs. But that feature is not present in this case. It is not sought to recover in this action, from Arbuckle, who dealt with Edwards & Co., purchasing the coffee from them and paying them, relying upon their being in possession of all the muniments of title.
It is settled law that an assignee for the benefit of creditors can take no better title than his assignor had to give him, and that he is not a purchaser for value.
The real defendant here is such an assignee. The ■defendant bank is a mere depository, and has no interest In or claim on the fund; the effort of the plaintiffs is to *16 impress a trust on these moneys in the hands of theassignee and of the bank. The sale of the coffee and the authority to make the sale is admitted, and it is proved1 that the bank and the assignee hold the proceeds thereof,, having no personal interest therein and having parted with nothing therefor.
The position then is that plaintiffs were the owners of the coffee ; that they delivered it to Edwards & Co., to sell' for them, and were entitled to the proceeds of the sale ;• that the sale was made and the money thus deposited with the defendants, into whose hands the proceeds are-traced ; that the proceeds of the identical coffee are traced direct to the deposit in question, and that such moneys are the proceeds of the said coffee.
From this it follows that plaintiffs are entitled to the-relief they seek, it being a well-settled rule of law in this-State that so long as money or property belonging to the principal or the proceeds thereof may be traced or distinguished in the hands of the agent or his representatives- or assignees, the principal is entitled to recover it unless it has been transferred for value without notice (Van Allen v. American Nat. Bank, 52 N. Y. 1; U. S. v. State Bank,. 96 U. S. 30; Pennell v. Deffell, 4 De Gex M. & G. 372; Overseers of the Poor v. The Bank of Virginia, 2 Grattan, 544).
In Pennell v. Deffell (supra), there was a contract between the successor of one Green, an official assignee in bankruptcy, and the personal representatives of Green for moneys standing to his individual credit in the Bank of England and another bank. These moneys had been deposited from time to time by Greenland consisted of funds received by him in his official capacity as trustee and his own individual funds. The account was kept in his individual name, and without any discrimination between the trust and private funds, and the question was whether the various persons interested in the trust funds could claim the respective amounts due them, or whether the defend *17 ants were entitled to receive and administer upon the money as a part of the estate of Green. The master of the rolls held that the cestui que trust could not hold the money because it had no “ earmark,” and could not be traced and distinguished within the principal before adverted to. This decision was reversed upon appeal to the court of appeals in chancery, where the Lord Justice Bruce says :
“ When a trustee pays trust money into a bank to his credit, the account being a simple account with himself not marked or distinguished in any other manner, the debt thus constituted from the bank to him is one which, as-long as it remains due, belongs specifically to the trust as much and as effectually as the moneys so paid would have done had it specifically been placed by the trustee in a particular repository and so remained ; that is to say, if the specific debt shall be claimed on behalf of the cestui que trust it must be deemed specifically theirs.”
In the case of the Overseers of the Poor v. The Bank of Virginia (supra), an attorney deposited a check for the amount of a judgment in favor of his clients, to his own credit, having a small amount of other money to his credit, and died. On the day of his death, a note fell due belonging to the bank which it claimed to set off, but the. court held that the clients were entitled to the money.
It follows from this reasoning that plaintiffs are entitled to the relief they pray for unless the defendants, have proven a general or special custom, altering the express terms of the trust receipt; and it is to this, point that I will now in conclusion address myself.
The decision of this point involves two questions.
First. Did the defendants prove at all such a custom general or special ?
Second. Would such a custom, if proved, avail to vary the express terms of the written contract ?
First: As to the first of these two questions: The defendants endeavored to establish that it was the general *18 custom in the trade, and that it was the especial custom of these plaintiffs in former transactions, that the bankers should not look to the proceeds of the coffees for the payment, nor require any accounting or return in respect thereof, but that the contract of the person to whom the credit was furnished—in this case Edwards & Co.—was merely to furnish funds in time to meet the bills drawn under the credit.
A careful examination of the testimony fails to convince me that the defendants have established the custom they attempted to prove. All the testimony of the witnesses proves is, that the plaintiffs, in all former dealings with Edwards & Co., were satisfied if the drafts accepted by them were cared for at maturity; the drafts were so met at maturity, and under such circumstances no accounting was had or required.
At the most, all that is to be concluded from this ■evidence is, that the plaintiffs were willing in every instance, when paid, to waive a formal accounting by the persons to whom they advanced the credit; but there is not a word of evidence, nor any offer of any to prove that the plaintiffs have at any time been willing, or that it was their custom or that of the trade generally, not to demand an accounting whenever they so desired. The payment of the drafts was evidently considered by the banks as sufficient appropriation and payment of the proceeds.
Second : As to the question whether the custom, if proved, was competent to vary the terms of this express agreement. A custom of this kind would not be binding upon the parties unless it was established that they had a knowledge of its existence, and had it in contemplation at the time of entering into the contract, or that it was so general that the parties are presumed to have contracted with reference to it (Harris v. Tumbridge, 83 N. Y. 92).
It is unreasonable to presume that any such custom ivas in the contemplation of the parties to the contract, *19 for any such custom would neutralize the very contract which the parties were making. In the consideration of such a subject it is our duty to consider the character of the business, the objects in view and the relations of the parties to each other. A merchant seeking for credit and financial aid applies to the banker. The banker, unwilling to give such aid upon the naked credit of the applicant, lends his capital under the careful and explicit ■conditions, however, that he be vested with the title to the merchandise, and that_the borrower assume a peculiar ■and binding obligation of a fiduciary character. In this way was evolved the system of commerical credits under trust receipts,' and this has now become a recognized, ■convenient and secure mode of furnishing capital to the merchants of the world.
Millions of capital are constantly under advance upon the faith of this class of security in reliance on the peculiar legal and equitable rights which are thus promised and secured to the bankers. The banker is assured that aside ■from the general liability of the borrower he has a title to the property against which his money has been advanced ; and the right to identify, follow and recover the merchandise or its proceeds, and to hold the borrower to a strict accountability for any breach of the trust relation. With great care and elaborate form the parties write down, •execute and exchange their mutual covenants to express these very relations. Can we possibly infer from such a ■condition of affairs that it was in the contemplation of the parties to nullify and render worthless the very contract which they were creating with so much formality and •care ?
To presume that such a custom entered into the contemplation of the party is to presume that they intended to destroy the essential and vital features of the contract itself. Such a custom would be inconsistent with and destructive of such a contract. We cannot presume that the parties with marked deliberation and method elabo *20 rated and executed a carefully worded contract establishing peculiar relations, declaring .the title in the banker and acknowledging the trust obligations of the borrower,, which contract it was their intention at the very moment of execution to disregard, and under which their relations-were to be fundamentally different from those which they were so careful to define.
I am thus led to the conclusion that the plaintiffs are-entitled to the relief they ask for, and findings may be-prepared in consonance with these conclusions.
The assignee makes application for the payment of his commissions as. such assignee out of the funds in question, and for an allowance to his counsel in the defense of this action. By the stipulation of counsel this, question is also submitted to me for decision in lieu of an application to the court. It appears that subsequent to. his appointment and qualification as assignee the deposit with the defendant bank was changed to the credit of theassignee before the commencement of this action. It was. the right and the duty of the assignee to require establishment of the plaintiffs’ claims at law. This duty he has performed with discretion and fairness. No vexatious or unreasonable defense has been made by him ; he has performed his duty to the trust he represents, but has not been captious or obstructive in so doing. It is agreed by counsel that the amount of his bond was influenced by this deposit; that he has had responsibility respecting the latter, and has defended the action in good faith. His counsel has represented the interests of the assignee and the creditors with fidelity, care and learning, and has. devoted much attention and labor to the case. As the plaintiffs came into this court of equity for its favor and relief, the court has power to require them to do equity.
It seems to me just that the assignee should be compensated out of the fund to a fair and reasonable degree both for his own services and that of his counsel. This sum under all the circumstances, I think should be fixed *21 •at $1,250 to cover such compensation, and $1,250 to cover his counsel fees and his expenses herein.
The assignee has also expended $120.77 in and about the property in question, which he should be reimbursed. A statement of the details of this sum was submitted, and I make reference to it. He has realized $859.14 from the sale of skimmings of the coffee in question, in addition to the sums already accounted for. He should be reimbursed said expenditures, and should pay over said further collections.
Let findings be prepared in consonance with these views.