UNION PAC. RY. CO. v. SCHIFF et al.

(Circuit Court, S. D. New York. January 27, 1897.)

**1. PLEDGE OF SECURITIES—WRONGFUL REHYPOTHECATION.**

A. pledged securities with B. as collateral, and B. wrongfully rehypothecated them, together with certain securities of his own, with C., to secure notes made by him to C. A., on learning thereof after B.'s insolvency, by taking up B.'s notes, acquired possession of all the securities, except a part of his own, which he left with C. as indemnity against claims, suits, and expenses. Both loans being overdue, A. sold B.'s securities, and applied the proceeds on B.'s notes. *Held*, that A. had a perfect right to do this, and did not thereby give B.'s receiver any right or claim on the securities left in C.'s hands.

**2. SAME—JUDGMENT FOR CONVERSION.**

Where a pledgee of securities has wrongfully rehypothecated them, and, after his insolvency, the owner has again obtained possession of them, by paying the debt for which they were rehypothecated, the fact that thereafter the owner recovers a judgment against the original pledgee for conversion of the securities does not vest the title thereof in such pledgee. If the judgment represents the securities, the rights of the parties will be protected by requiring the owner to indorse a suitable credit on the judgment.

This was a suit in equity, in the nature of a bill of interpleader, filed by the Union Pacific Railway Company, for its receivers, S. H. H. Clark and others, against Jacob H. Schiff and others, composing the firm of Kuhn, Loeb & Co., C. W. Gould, as assignee of the firm of Field, Lindley, Wiechers & Co. for the benefit of creditors, and Norman S. Dike, as receiver of the assets of the latter firm.

This cause has been several times before the court. The last time in June, 1896. 74 Fed. 674. The court then suggested that until the dispute with Kuhn, Loeb & Co. was adjusted, a decree establishing the right of the other parties would be a mere brutum fulmen. Pursuant to this intimation the counsel for the various parties agreed upon a settlement of the claims of Kuhn, Loeb & Co. and of Romulus R. Colgate. They further stipulated that pending the decision of the controversy between the complainant and the other defendants the securities in question shall be held by the Lawyers' Surety Company. The cause is now before the court for the sole purpose of determining the respective rights of the Union Pacific Company and of the defendant Dike, as receiver, and of the defendant Gould, as assignee, in the said securities. It is stated in the record that separate answers were filed by Kuhn, Loeb & Co., by Gould and by Dike. The answer of the latter is the only one submitted. None of the exhibits are returned, and but two are set out in full. As to the others counsel have agreed upon what is called "a summary or substantially accurate statement of their contents." The Dietz judgment declaring the assignment to Gould to be fraudulent and void appears not to have been offered in evidence, and the court is not advised as to the scope of the judgment or the grounds upon which it proceeds. This suit was commenced February 28, 1895.

E. Ellery Anderson, Artemas H. Holmes, and Holmes & Adams, for complainant.

Jasper W. Gilbert, Frederic A. Ward, James S. Bishop, and Alman Goodwin, for defendants Dike, as receiver, and Gould, as assignee.

COXE, District Judge. In May, 1891, the complainant, the Union Pacific Railway Company, borrowed from Field, Lindley, Wiechers & Co. $500,000 upon two promissory notes each for $250,000, dated, respectively, May 21st and May 22d, and payable six months after date. In July, 1891, the complainant borrowed $350,000 more from the Field firm upon similar notes. As collateral security for the

payment of these notes the complainant deposited with the Field firm certain railroad bonds. Payments had from time to time been made on the notes, and on the 27th of November, 1891, there was due thereon the sum of $687,025. The face value of the collaterals was $1,573,000, and the actual value on November 27th was $1,163,060, or $476,034 more than the indebtedness. On the 7th and 14th of November, respectively, the Field firm borrowed of Kuhn, Loeb & Co. the sum of £50,000 sterling upon two sterling loan notes, payable 60 days from date. The notes provided, among other things, that Kuhn, Loeb & Co. might transfer them and the securities held therefor, and if upon a sale of the securities there should be a deficiency the Field firm was to pay it, and if there should be a surplus it was to be returned to the Field firm. To secure these notes the Field firm deposited with Kuhn, Loeb & Co. $307,472 of the securities of the complainant, $136,150 belonging to other parties and $165,725 belonging to the Field firm; in all $609,344. On November 27, 1891, the Field firm failed and made a general assignment to Charles W. Gould. This assignment was subsequently declared fraudulent and void by the state court, and the defendant Norman S. Dike was, on December 2, 1893, appointed receiver of the property of the firm. The character of the fraud upon which the court based its action does not appear. On the 27th and 28th days of November, 1891, the complainant tendered to the Field firm all the money due on said promissory notes upon the surrender of the notes and the bonds deposited as collateral security therefor, and on the maturity of the notes the complainant tendered to the Field firm the amount due thereon and demanded the return of its bonds, which was refused by the Field firm. About four days after the failure of the Field firm the complainant learned of the rehypothecation of its bonds with Kuhn, Loeb & Co., and, on the 1st of December, notified Kuhn, Loeb & Co. of its rights in the securities so pledged. On December 14, 1891, the complainant paid the sterling notes and Kuhn, Loeb & Co., having indorsed them "without recourse," transferred them and the securities therefor to the complainant upon the latter executing the paper of December 14th, which is no longer the subject of controversy. The substance of the agreement of December 14th, so far as it is necessary now to consider it, was that the complainant was to leave with Kuhn, Loeb & Co. $170,000 of Oregon Short Line bonds as indemnity against claims, suits and expenses. On the 6th of April, 1892, other securities worth about $123,000 were substituted for the Oregon bonds, and it is over these substituted securities that this controversy arises. Upon receiving the securities from Kuhn, Loeb & Co. the complainant shortly after December 14, 1891, delivered to the other parties whose property had been wrongfully rehypothecated by the Field firm their securities, or the value thereof, upon receiving from said owners their aliquot proportions of the cost of obtaining possession thereof. In January, 1892, the securities deposited by the Field firm were, in the ordinary course of business, sold by complainant and the proceeds, amounting to about $165,721, credited to the Field firm. On the

7th of August, 1894, the complainant recovered a judgment in the supreme court of New York against the Field firm in the sum of $552,961.

No criticism is now made of the conduct of Kuhn, Loeb & Co. They acted in entire good faith. The transaction with them was in the usual course of business, they being wholly ignorant of the fact that the collaterals offered for the sterling loans were misapplied by the Field firm. In case of nonperformance of the agreement by nonpayment of the notes or otherwise, Kuhn, Loeb & Co. had a right to sell the securities. In the ordinary course of business, had there been a failure to pay the notes at maturity, Kuhn, Loeb & Co. would have sold the securities, paid the notes and returned the surplus to the Field firm. Had they been informed that part of the securities belonged to other parties and that the Field firm had wrongfully misapplied them it would, upon proof of this fact, have been their duty to sell the Field securities first. The Field firm received $494,000 in cash from Kuhn, Loeb & Co. Their property was in the hands of Kuhn, Loeb & Co. pledged to the payment of the debt. Would Kuhn, Loeb & Co., with full knowledge of the facts, have been permitted to discharge the Field debt with the complainant's property and return the Field property to the firm? It is thought not. Such a transaction would be a palpable fraud. It would, in legal effect, compel the complainant to pay the Field debt without a dollar of consideration. It would enable Field to defraud the complainant out of $494,000, leaving the latter nothing but a naked cause of action.

That the complainant had the right to compel the application of the Field securities to the payment of the debt before resort was had to the securities of the complainant and other innocent parties is well settled. Smith v. Savin, 141 N. Y. 315, 36 N. E. 338; Farwell v. Bank, 90 N. Y. 483; Gould v. Trust Co., 6 Abb. N. C. 381; Le Marchant v. Moore, 150 N. Y. 209, 44 N. E. 770. Thus all interest of the Field firm or its assignee was, or at least might have been, extinguished. The Field securities were wholly inadequate to pay the notes. The right of property in the complainant's bonds did not pass to the Field firm and it did not pass to Kuhn, Loeb & Co.; it remained with complainant, subject to the lien of the bankers. Wheeler v. Newbould, 16 N. Y. 392. When released from the latter lien by the payment of the sterling notes the bonds belonged to the complainant. If the Field firm had no balance with Kuhn, Loeb & Co., if they had no surplus, if they had no equities in Union Pacific's securities, it is difficult to see how their creditors or their receiver has any interest. All that the Field firm risked in the transaction was property worth $165,721. By misappropriating the property of the Union Pacific and others they were able to get nearly $500,000 from Kuhn, Loeb & Co.

It is argued that the Field firm and its representatives should receive back a percentage of their own securities not only, but also a percentage of the property of the Union Pacific amounting to $61,494. If this position can be maintained the Field firm and its representative will realize a net profit from the loan of $428,492.

Upon what principle of law or equity could the Field firm have claimed a return of any part of their inadequate collaterals or have based a right to levy a percentage upon the property which they had wrongfully misapplied? Their receiver stands in no better position than the firm. He succeeds to their rights and takes subject to all equities, liens, and incumbrances. Yeatman v. Savings Inst., 95 U. S. 764, 766. If they could not treat the property of others as their own, neither can he. Le Marchant v. Moore, supra.

Can there be any doubt that when the Union Pacific offered to pay the notes at their maturity and demanded back its securities that it was entitled to receive them? Can there be a doubt that the rehypothecation of these securities only a week or two before the notes fell due was a fraud upon the Union Pacific's rights? Can there be a doubt that the perpetrators of this wrong should not be permitted to make a profit by it? The complainant was clearly entitled as between it and the Field firm to the pledged securities or their proceeds. The complainant's title was superior to that of any creditor or assignee of the Field firm who took subject to the prior equities of the complainant. No one but Kuhn, Loeb & Co. was in a position to dispute those equities, and they only to the extent of their advances, after reimbursing themselves first out of the Field property in their hands. Hazard v. Fiske, 83 N. Y. 287, 299. The right of the complainant to take up the sterling notes and require a transfer of the collaterals held by Kuhn, Loeb & Co. with subrogation to their rights does not seem seriously to be disputed. The notes authorized the transfer in express terms and the waiver of all right of action against Kuhn, Loeb & Co. would seem to be an admission that their action in this regard was proper. Indeed, it is asserted by the complainant and not denied by the defendants that "no party to the suit assails the title by which the bankers originally acquired, and, on December 14, 1891, held the notes and collaterals, nor the validity of their act of selling and transferring their title to plaintiff." If the Union Pacific succeeded to the rights of Kuhn, Loeb & Co., whatever they could do it could do. The sale of the Field securities to satisfy the Field notes was proper. What equity would have compelled Kuhn, Loeb & Co. to do it will not condemn the complainant for doing. The property which the complainant saved from the wreck was its own, surely it should not be required to deliver it to those who represent the wrongdoers. The defendants expressly admit that the railway company "had a right to compel Kuhn, Loeb & Company to sell them [the Field securities] before resorting to their own," but says the learned counsel, "that course was rendered impossible by their own act in becoming subpledgees and was conclusively surrendered by their own acts as such subpledgees." The court is unable to see why in being subrogated to the rights of the bankers the complainant lost its own rights; why it could not itself do what it had a right to compel the bankers to do. Even assuming that the complainant misconceived its remedy it is not easy to perceive why its mistake inured to the benefit of the defendants.

It is said that from the sale of all the pledged property there arose a surplus for all of the owners—the Field firm among the rest—and that complainant cannot now proceed as if there had been a legal marshaling of the securities. The proposition is not strictly correct in fact, as there was no sale except of the Field securities. But assuming that the proceeding was tantamount to a sale, it is thought that the argument proceeds upon the erroneous assumption, that all of the securities stood upon an equal footing, and that the party responsible for the fraud upon the other owners had the same equities as they. If the proper adjustment of surplus was not made, the Field firm and its representatives have no right to complain. They have not been injured or misled. That their securities should go to the last dollar to pay their debt before the property of innocent parties, wrongfully converted by them, should be resorted to is manifest. That these securities were sold and the proceeds so applied is also true. If the margin due to others was not adjusted with reference to this application of what moment is it to the representatives of the Field firm? The other owners might complain but how are the defendants injured? So far as they are concerned it is not easy to see what formalities were omitted which were necessary to foreclose their entire interest.

Again, it is argued that the complainant has lost the right to hold its own securities because two years and eight months after it obtained possession of them it recovered a judgment against the Field firm for conversion, the damages amounting, in the aggregate, to $552,961. In support of this position a recent decision of the appellate division of the second department of the supreme court of New York is cited. Dietz v. Field, 41 N. Y. Supp. 1087. If the doctrine there enunciated is applicable to the present controversy it precludes the complainant from holding even the excess in value of its own bonds, and prevents any recovery whatever. It must relinquish every advantage and rely solely upon a worthless judgment against an insolvent firm.

It is argued by the complainant that this is not the doctrine of the federal courts, and the sententious language of Mr. Justice Miller, in Lovejoy v. Murray, 3 Wall. 1, 16, is quoted in support of this contention, as follows:

"In reference to the doctrine that the judgment alone vests the title of the property converted, in the defendant, we have seen that it is not sustained by the weight of authorities in this country. It is equally incapable of being maintained on principle. The property which was mine, has been taken from me by fraud or violence. In order to procure redress, I must sue the wrongdoer in a court of law. But, instead of getting justice or remedy, I am told that by the very act of obtaining a judgment—a decision that I am entitled to the relief I ask—the property, which before was mine, has become that of the man who did me the wrong. In other words, the law, without having given me satisfaction for my wrong, takes from me that which was mine, and gives it to the wrongdoer. It is sufficient to state the proposition to show its injustice."

The decision of the appellate division is strongly supported by authority and is entitled to great respect; whether it would be the judgment of the supreme court of the United States in similar circumstances it is unnecessary to determine, for the reason that it is

clearly distinguishable from the present controversy upon the facts. Briefly, the facts were these: An application was made in the action which resulted in the appointment of Dike as receiver to compel him to deliver to the Union Pacific Company certain bonds which he had recovered of I. and S. Wormser, and also to pay to the company certain money which he had recovered of the Wormser firm. This was after the judgment of August, 1894, and also after the company had sued the Wormser firm for the conversion of the bonds. It was held that the commencement of these two actions of conversion was an election to let the bonds go and recover their value instead. In the present case, on the contrary, the complainant plainly elected in December, 1891, to follow the securities. It obtained possession of them, and has never relinquished it except so far as it permitted a part to remain as security with Kuhn, Loeb & Co. In the Wormser case the defendant Dike had recovered the property by a judgment of the court, and it was actually in his possession when the complainant sought to retake it. Here the property is in the possession of the complainant not only by virtue of the original ownership, but also by virtue of the transfer of the sterling notes for which it was pledged as collateral. The right to that ownership has been uniformly and consistently maintained. Had Kuhn, Loeb & Co. surrendered all the collaterals, the complainant retaining possession ever since, could the receiver recover them upon the theory that the judgment two years afterwards wrested the title from the complainant and vested it in the receiver? It is thought not. The election took place in December, 1891, when complainant determined to take its bonds even at the cost of paying the sterling loans. From that day to the present the complainant has had possession of them. It is of no moment that some of the bonds were left with Kuhn, Loeb & Co. as security. None the less were they the complainant's bonds. In contemplation of law it is precisely as if all the securities had been delivered to the complainant, and the receiver were suing to recover them upon the theory that the subsequent judgment gave him title. It is thought that such an action could not be maintained. If the Field firm had appeared in the action against them and pleaded the set-off, the proper reduction, undoubtedly, would have been made. To hold that a judgment recovered in this manner operates to take from the complainant property which he owned and had actually in his possession for more than two years, is going much further than any adjudication with which the court is familiar. The facts in the present action make it very clear that there was no election to abandon the remedy against the bonds but, on the contrary, to hold them against all comers. Assuming that the complainant has recovered for the conversion of these bonds it is not too late to correct the mistake. The judgment has not been paid and the amount of the recovery may yet be credited thereon.

To recapitulate: The court cannot resist the conclusion that it would be unjust to divide among the creditors of the Field firm property which belonged to the complainant and which was fraudulently misapplied by that firm. The sole cause of the difficulty

was the wrongful act of the Field firm. The loss to the complainant by reason of that act will, in any event, be large. A court of equity should not add to this loss at the behest of those who represent the original wrongdoer. It should not deprive the complainant of its property upon narrow or technical grounds. The complainant has done no wrong; it has been guilty of no fraud. To turn over the remnant of its securites, which the complainant by diligence and activity was able to save from the wreck, to the successor of the fraudulent firm, would seem most inequitable. If the judgment represents the securities in controversy the rights of all parties will be protected by compelling the indorsement on the judgment of a suitable credit as a condition precedent to the delivery of the securities.

The complainant is entitled to a decree for the delivery to it, or its receivers, of the property now held by the Lawyers' Surety Company.