WILLIAM I. MILLER et al.

v.

WILLIAM C. RICH, Sr. et al.

*Opinion filed October 26, 1903.*

1. EXECUTORS AND ADMINISTRATORS—*heirs may file bill to set aside sale by administrator to himself.* Heirs may maintain a bill to set aside a sale of land by the administrator to himself, notwithstanding the intentions of the administrator were honest and that there was no fraud in fact.

2. SAME—*when sale by an administrator is, in effect, to himself.* A sale by an administrator to his son, who deeded the property to his mother, who subsequently transferred it to her husband, the administrator, is, in effect, a sale to the administrator himself, particularly where he furnished all the consideration.

3. SAME—*administrator is entitled to have accounting where his sale is set aside.* Upon setting aside a sale by an administrator to himself at the suit of the heirs, the administrator is entitled to an accounting, wherein he should be charged with the rents and profits received from the property and credited with moneys paid out to discharge valid debts against the estate, for taxes and for such improvements as substantially benefit the estate.

4. LIMITATIONS—*when deeds cannot be relied upon as color of title.* Deeds acquired by an administrator and his son by breach of the fiduciary relation which they bore to the estate cannot be relied upon as color of title made in good faith, within the meaning of the seven years Statute of Limitations.

5. SAME—*proof of payment of taxes must show continuity.* Continuity in payment of taxes under the seven years Statute of Limitations is not shown where there is no tax receipt in evidence for one of the years during the period relied upon.

6. RECORD—*when record shows date of filing bill.* The record of a chancery suit containing a docket entry giving the general number of the suit, its title, names of attorneys and nature of the action, and which states that the suit was commenced at a certain date, sufficiently shows that the bill was filed on such date, since there is no way of beginning a chancery suit but by filing the bill.

WRIT OF ERROR to the Circuit Court of Union county; the Hon. JOSEPH P. ROBARTS, Judge, presiding.

This is a bill in chancery, filed by the heirs of Isaac Miller, deceased, to set aside a deed made by the defendant, William C. Rich, Sr., as administrator of the estate

of said Miller, to his son, Will J. Rich, and to set aside a deed made by said Will J. Rich to his mother, Milly C. Rich, and to set aside the deed from the said Milly C. Rich to her husband, William C. Rich, Sr., the original administrator of the estate, and for an accounting between the complainants and defendants for the rents and profits.　The bill was answered by the three defendants below, and, upon final hearing, the court below found the, equities of the case with the defendants, and dismissed the bill at the cost of the complainants, to which exception was taken by the complainants.　This writ of error is sued out for the purpose of reviewing such decree.

The original bill in the case was filed on March 10, 1893, and the original answer thereto was filed on December 4, 1893; and the replication to that answer was filed on June 26, 1894.　Subsequently, upon motion of the complainants, leave was granted to them to supply the lost papers, and, under an order of court, complainants filed a copy of the original bill, which was lost.

The pleadings and proofs show substantially the following facts:　Isaac Miller died on January 9, 1880, leaving Surelda E. Miller, his widow, and the following children, to-wit: Christina Lewis, Sarah A. James, George Miller, Clarinda E. Smith, Malinda Sides, Joshua Miller and Easter A. Miller, afterwards Easter A. Armstrong, and the following grandchildren, to-wit:　Robert Collier and Andrew Collier, children of a deceased daughter, named Mary Collier, and William I. Miller and John Miller, children of a deceased son, named Alexander Miller. After Isaac Miller's death his son George Miller died, leaving a daughter, Easter A. Miller, and after his death, Sarah A. James died, leaving two children, to-wit: William James and George James; and after her father's death Christina Lewis died, leaving a son named William Allen Lewis; and on June 15, 1892, Joshua Miller, the son of Isaac Miller, died at the age of eighteen or nineteen years.

When the original bill was filed on March 10, 1893, the following were the children of Isaac Miller, deceased, to-wit: Easter A. Armstrong, Clarinda E. Smith and Malinda Sides; and the following were his grandchildren, to-wit: William I. Miller, John Miller, Easter A. Miller, William James, George F. James, William Allen Lewis, Robert Collier and Andrew Collier. Four of these children were minors when the original bill was filed, and sue by their next friends.

At the time of his death, Isaac Miller owned 360 acres of land in Union county where he lived, described as follows: The north half (or the north-east quarter and the north-west quarter) of section 11, and the south-east quarter of the south-west quarter of section 2, all in township 12 south range 3, west of third principal meridian in Union county. At the time of his death he was the head of a family, and resided upon these premises with his widow and three of his minor children, to-wit: Clarinda Miller, afterwards Clarinda Smith, Easter Adeline Miller, afterwards Easter A. Armstrong, and Joshua Miller. The widow, and the three minor children last named, lived on said premises as their homestead until the death of the widow about December 20, 1880. The three minor children were living on the land at the time of the administrator's sale hereinafter mentioned, which took place on August 20, 1881. The homestead of the minors was not ascertained or adjudicated upon by the county court, nor was a homestead ever set off to them in any way. The present bill was filed March 10, 1893, about nine months after the death of Joshua Miller, who died on June 15, 1892, at the age of eighteen or nineteen years.

Before his death, Isaac Miller and his wife executed a mortgage dated August 18, 1879, upon the north-west quarter of the north-east quarter of said section 11 to secure a note for $426.47, dated August 18, 1879, and payable to the order of Seth Tripp, guardian; on Sep-

tember 7, 1880, the note for $426.47, was assigned by Seth Tripp, guardian, to A. Polk Jones.

In his lifetime, Isaac Miller, and his wife, executed another mortgage in 1868, or in 1878, to the board of school trustees of township 12, etc., to secure a certain note, made by Isaac Miller for $233.00 upon the north-east quarter of said section 11. There was a foreclosure of this mortgage and a decree of sale entered on September 5, 1879, and on January 31, 1880, the north-east quarter of section 11 was sold under said decree by the master in chancery to A. Polk Jones for $110.41, and a certificate of sale was issued by the master to the purchaser, A. Polk Jones, bearing date January 31, 1880. Special executions were issued on April 13 and May 20, 1881, in favor of certain creditors for the purpose of redeeming from said master's sale, and, under said executions, the north-east quarter of said section 11 was sold by the sheriff on May 28, 1881, to William C. Rich, Sr., for $240.00, and a certificate of purchase was issued to him, which certificate of purchase he subsequently assigned to his son, Will J. Rich. Thereafter, on January 10, 1882, a sheriff's deed was issued to Will J. Rich, conveying the north-east quarter of section 11, which sheriff's deed was recorded on January 28, 1882.

On the 23d day of June, 1879, and in the lifetime of Isaac Miller, all of said 360 acres, to-wit, the north-east quarter and the north-west quarter of said section 11, and the south-east quarter of the south-west quarter of said section 2, were sold for taxes to one Frank J. Hanners, who subsequently assigned his certificate of purchase to said Will J. Rich, and on January 28, 1882, a tax deed was issued to Will J. Rich, conveying said premises to him, which deed was recorded on March 8, 1882.

TAYLOR DODD, and R. A. PEERY, for plaintiffs in error.

MONROE C. CRAWFORD, and P. E. HILEMAN, for defendants in error.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

Isaac Miller died on January 9, 1880, owning the 360 acres of land here in controversy, and William C. Rich, Sr., was appointed administrator of his estate on March 26, 1880. On May 9, 1881, William C. Rich, Sr., administrator of the estate of Isaac Miller, deceased, filed his petition in the county court of Union county for the sale of said 360 acres for the purpose of paying the debts of the estate. The petition alleged, that the claims against the estate probably amounted in the aggregate to about $2301.07, including the widow's award; that the amount of the personal property, as appraised, was $376.80, which was taken by the widow, and that the amount of the deficiency was probably about $1922.07. The testimony tends to show, that the figures in the petition were incorrect, and that the claims against the estate were only about $1461.43, and the personal assets were about $395.36, leaving a deficit, outside of the cost of administration, of $1066.07. On July 19, 1881, an order was entered, directing a sale of the property to pay the debts. On August 20, 1881, the administrator sold all the property at public sale to his son, Will J. Rich, for the sum of $215.00, for which amount Will J. Rich gave his promissory note for $215.00, with one Willard as security, payable in twelve months, drawing six per cent interest, and also secured by a mortgage on the 360 acres sold to him. At the sale the administrator stated, that the amount of the bid must be so much over and above the claims against the estate, which were held by his son.

On December 23, 1880, A. Polk Jones assigned to Will J. Rich, the note for $426.47, secured by mortgage upon the property. This note was held by Will J. Rich at the time of the administrator's sale on August 20, 1881. On the same day, December 23, 1880, the master's certificate held by A. Polk Jones, and issued to him as purchaser at the sale of the north-east quarter of section 11 on Jan-

uary 31, 1880, under the decree of September 5, 1879, was assigned by Jones to Will J. Rich. When the administrator's sale took place on August 20, 1881, Will J. Rich held the sheriff's certificate of sale, which had been assigned to him by his father, William C. Rich, Sr., who purchased the property at the execution sale made on May 28, 1881, conveying the north-east quarter of said section 11. When the administrator's sale was made on August 20, 1881, Will J. Rich also held, by assignment, the certificate of purchase, which had been issued to the purchaser at the tax sale, and upon which he subsequently received a tax deed on January 28, 1882. The proof tends to show that the amount, for which the property was sold at the administrator's sale to Will J. Rich, was $1027.19. This amount was made up of the $215.00 bid by Will J. Rich at the administrator's sale, and $812.19 of claims then held by him against the estate. These claims were the amounts paid out for the Seth Tripp note, and for taxes, and for the certificate of purchase issued at the sheriff's sale, at which his father was the purchaser. The proof shows that all the money, used by Will J. Rich to buy up these claims against the estate, amounting to $812.19, and to pay the amount of his bid over and above these claims, to-wit, $215.00, was advanced by William C. Rich, Sr. An administrator's deed was made out to Will J. Rich, the son, by William C. Rich, Sr., as administrator, dated August 20, 1881, when the administrator's sale was made. Evidently, bidders were deterred from bidding at the sale by the statement, that the purchaser must buy the property subject to claims held by Will J. Rich. The testimony of the defendants tends to show that the premises were, at the time of the sale on August 20, 1881, worth from $1000.00 to $1300.00; but the testimony of the complainants tends to show that they were worth from $3000.00 to $3600.00.

*First*—It thus appears that Will J. Rich, the son of the administrator, used money, furnished to him by the

204—29

administrator himself, to buy up the claims against the
estate, and to make his bid upon the property. We dis-
cover no evidence in the record that Will J. Rich ever
paid any money upon his bid made at the sale on August
20, 1881. He not only owned the note and mortgage upon
the property, which had been executed to Seth Tripp,
guardian, but he held three deeds to the property, to-wit,
the administrator's deed, executed to him by his father
on August 20, 1881, conveying the 360 acres, a sheriff's
deed conveying the north-east quarter of section 11 and
executed on January 10, 1882; and a tax deed executed to
him, and bearing date January 28, 1882, conveying all
the property.

On November 24, 1882, Will J. Rich executed a deed to
his mother, Milly C. Rich, the wife of William C. Rich, Sr.,
conveying to her the whole 360 acres. It is claimed by
Will J. Rich, that his mother paid him $100.00 in cash,
and gave him her note for $1400.00, making altogether
$1500. It appears that, when the petition to sell the
land was filed by the administrator in the county court of
Union county, Will J. Rich was at first made a defendant,
but before the order was made, directing the property to
be sold, the petition was dismissed as to him, so that his
attitude in relation to the property was not presented to
the county court. Will J. Rich says in his testimony:
"At the time of the land sale I owned the Seth Tripp
note, the tax certificate, and the sheriff's certificate; my
father advanced me the money paid on all the claims,
and I paid him after I made the sale to mother when we
settled; I don't know how much I paid him when we set-
tled; I don't know what became of the Seth Tripp note,
and tax certificate."

In his testimony, W. C. Moreland, a lawyer and son-
in-law of William C. Rich, Sr., says that Will J. Rich,
and his father, had a settlement in December, 1882. At
this settlement Will J. Rich turned over the note for
$1400.00, which his mother had given him, to his father

to reimburse his father, as he claims, for the money, which his father advanced to him to purchase the claims against the estate, and to buy the property at the administrator's sale.

On July 5, 1886, Milly C. Rich executed a deed conveying all the premises to her husband, William C. Rich, Sr. William C. Rich, Sr., claims to have bought the premises of his wife, but he made the purchase by turning over to his wife her note for $1400.00, which she had given to their son, and which their son had turned over to William C. Rich, Sr., his father, the administrator. That William C. Rich, Sr., advanced the money to his son to buy these claims is stated by him in his report of sale to the county court. When the note for $1400.00, executed by Milly C. Rich to her son, was turned over to William C. Rich, Sr., the latter was still administrator of the estate.

The record presents a case, where the administrator of an estate sells property belonging to the estate at a price largely less than its value to his own son, he furnishing all the money used by his son in purchasing the property, and where the son, not long after he gets his deed from the administrator, transfers the property to his mother, the wife of the administrator, in exchange for his mother's note, and where the mother subsequently conveys the property to her husband, the administrator, in exchange for her own note. Clearly, the case is one where an administrator has purchased property of the estate, of which he is administrator, at his own sale. The facts proven lead to no other conclusion. A court of equity will not sustain such a transaction.

The heir has a right to file a bill in equity to set aside a sale of land by the administrator where the latter has made the purchase for himself. It makes no difference in such case, that the intentions of the administrator are honest, and that there is no fraud in fact. The sale will be set aside upon the general ground that trustees, and others occupying fiduciary relations, cannot purchase on

their own account the property entrusted to their management. Administrators act in a fiduciary capacity in the sale of property, and settlement of estates. In *McCreedy* v. *Mier*, 64 Ill. 495, we said: "An administrator, who procures an order of sale of realty, cannot be permitted to become himself a purchaser at the sale. That position would be inconsistent with his fiduciary relations."

In *Miles* v. *Wheeler*, 43 Ill. 123, it was held that the purchase of real estate, belonging to the deceased, by an administrator through the intervention of a third party at his own sale is fraudulent *per se;* that it matters not that the sale was at public auction for a fair price, and made through the medium of a third party as a bidder, and to whom the administrator conveyed; that the law forbids all administrators, executors and others, sustaining a fiduciary relation, from dealing on their own account with the thing, or the persons falling within that trust or relation; that it avails nothing to show that the intentions of the administrator were honest, and that there was no fraud in fact; that the law shields him from all temptation by the inflexible rule, that he cannot buy at his own sale; that the reason of the rule is, that the interests of the buyer and seller of the same property are necessarily antagonistic, and the only safe rule is one, which absolutely forbids a trustee to occupy two positions inconsistent with each other.

In *Lagger* v. *Mutual Union Loan Ass.* 146 Ill. 283, we said: "The law forbids an administrator to purchase at his own sale, whether the purchase is in his own name, or in the name of another for his use."

*Second*—The defendants claim, that they have been in possession of the property under claim and color of title, made in good faith, for seven successive years, and paid all the taxes upon the property during the years in question. The Statute of Limitations in regard to possession for seven years under color of title cannot be used as a defense in a case like this. Neither the admin-

istrator's deed, nor the sheriff's deed, nor the tax deed, can be regarded as color of title made in good faith. The administrator's deed to Will J. Rich was a fraudulent deed, and, so far as the amounts paid for the sheriff's deed and the tax deed are concerned, it was the duty of the administrator and his son, under the circumstances of this case, and in view of the relations which they bore to the estate, to pay the money necessary to redeem from the sheriff's sale, and from the tax sale, for the benefit of the estate. In equity they were trustees, holding the titles which they had for the benefit of the estate, and, therefore, they cannot use the deeds, conveying to them such titles, as color of title made in good faith. (*Hodgen* v. *Henrichsen*, 85 Ill. 259; *Hardin* v. *Gouveneur*, 69 id. 140; *Dalton* v. *Lucas*, 63 id. 337; *Oswald* v. *Wolf*, 129 id. 200; *Burton* v. *Perry*, 146 id. 71; *Coleman* v. *Billings*, 89 id. 183).

The first deed, obtained by Will J. Rich, was the administrator's deed of August, 1881. The next deed was his deed to his mother in November, 1882. The deed from Milly C. Rich to her husband, the administrator, was made in 1886. Even if the deed by the administrator to Will J. Rich, and the deed from the latter to his mother, could be regarded as supporting a color of title made in good faith, surely the deed made by Milly C. Rich to her husband, the administrator, cannot be regarded as claim or color of title made in good faith, because it was a deed, which conveyed to him, as administrator, the property belonging to the estate, of which he was administrator. But if this were not so, the proof shows, that there was not a payment of taxes for a full period of seven years before March 10, 1893, when the original bill in this case was filed. There was no proof of the payment of taxes, except by receipts given by the tax collector. There is no receipt in the list for the year 1887, and the receipt for the year 1889 is not signed by the collector. In view of these breaks in the continuity of the payments, there was no full period of seven years, during which the taxes

were paid, even if there were no fraud in the case, either actual or constructive, which deprived the deeds in question of the good faith required to make them valid claim and color of title. As we read the record, the position of the counsel for defendants in error, that no objection was made to the receipts for the years 1887 and 1889, is not well taken. The record shows that the complainants objected to each and every one of the tax receipts, offered for the purpose of proving title and payment of taxes. Whatever admission was made was merely in reference to such of the tax receipts, as actually showed a payment of taxes on the land in controversy.

*Third*—It is claimed by defendants in error that this suit must be regarded as having been begun at the June term, 1899, when the lost papers, including the bill and answer, were restored. We think the record fairly shows that the original bill in this case was filed on March 10, 1893, and that the copy, which was subsequently filed in 1899 or 1900, was a copy of the lost bill, filed on March 10, 1893, and was filed in the place of the lost copy pursuant to an order of court, permitting it to be so filed. The docket entry on the first page of the record shows that there was an entry on the general docket, giving the general number of the cause, and that the suit was commenced on March 10, 1893, giving the title of the suit, and the names of the attorneys, and the nature of the action, which was a bill to set aside a sale by an administrator. This docket entry was as much a part of the record as any portion of it, certified by the clerk. It is admitted by counsel for defendants in error, that "there is no way of beginning a chancery suit but by filing a bill." The statement on the record, therefore, that suit was commenced on March 10, 1893, is a statement that a bill was filed on that day. The paper in the record, described as the supplied bill of complaint, is the document upon which the defendants below went to trial without objection; and an order of court was entered at the Novem-

ber term, 1900, allowing complainants below to supply lost papers, and an order of court was made at the March term, 1902, allowing the complainants to file copy of bill, which order also shows that the cause was submitted on bill, answer and replication. Another order in the record shows that the cause was submitted to the presiding judge in the court below on the supplied bill at the March term, 1902. The record affirmatively shows, not only that the original bill was filed on March 10, 1893, but that the defendants below demurred to the bill, and were ruled to answer the same at the November term, 1893; and it also shows that they did file their original answer on December 4, 1893, and that replication was filed on June 26, 1894, and the amended answer on June 29, 1895. The defendants appeared at the return term of court, November, 1893, and entered their appearance, and demurred to, and answered the bill, and contested the case up to the final hearing. We are, therefore, of the opinion that the record shows that the original bill in this case was filed on March 10, 1893, and that the supplied bill was a copy of the original bill lost or destroyed.

*Fourth*—We have held that, where a sale, made by an administrator to himself, is set aside upon bill filed by heirs for that purpose, the administrator is a trustee, and, as such, is entitled to have an account stated, and that, in stating the account, he should be charged with the rents and profits received from the property, and credited with moneys paid out in discharge of valid debts against the estate, and with moneys paid out for taxes, and such improvements, as have substantially benefited the estate, in accordance with the principles laid down in *Lagger* v. *Mutual Union Loan Ass. supra*, and the cases therein referred to.

Accordingly, the decree of the circuit court of Union county, dismissing the bill, is reversed, and the cause is remanded to that court with directions to proceed in accordance with the views herein expressed.

*Reversed and remanded.*