TURNER et al. v. KIRKWOOD. *

No. 357.

Circuit Court of Appeals, Tenth Circuit.

April 2, 1931.

Rehearing Denied May 18, 1931.

*Rehearing denied June 1, 1931.

R. W. Stoutz, of Tulsa, Okl., for appellants.

Preston C. West, of Tulsa, Okl. (John D. DeBois, of Searcy, Ark., and West, Gibson, Sherman, Davidson & Hull, of Tulsa, Okl., on the brief), for appellee.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

Julia A. Turner was the owner of certain lots in Muskogee, Indian Territory. She deeded an undivided one-half interest in such lots to her son, Fred E. Turner. She and Fred E. Turner incorporated the Old Homestead Company under the laws of Arkansas, which were then in force in the Indian Territory, with a capital stock of 2,000 shares of the par value of $25.00 per share. The capital stock of the Homestead Company was issued in exchange for such lots. Julia A. Turner and Fred E. Turner each received 999 shares and Gunter M. Turner, wife of Fred E. Turner, and James M. Givens each received one share.

In 1909, Julia A. Turner mortgaged certain real estate and pledged her 999 shares of Homestead Company stock to the National Bank of Commerce in St. Louis to secure an indebtedness of approximately $450,000 owed to the bank by her son, Clarence W. Turner. The contract of pledge provided that Julia A. Turner should be entitled to all dividends earned on such stock during her lifetime and that the pledge should not be foreclosed or the stock sold to pay the indebtedness of Clarence W. Turner until sixty days after her demise.

In August, 1914, Julia A. Turner and Fred E. Turner incorporated the Eureka Realty Company under the laws of Oklahoma, with a capital stock of 8,000 shares of the par value of $25.00 per share. 7,997 shares were issued in exchange for property of the Homestead Company valued at $200,-000.

On August 4, 1914, the directors of the Homestead Company declared a dividend of the Eureka Company stock and distributed it as follows: Fred E. Turner, 3,996 shares; Julia A. Turner, 3,996 shares; J. M. Givens, 4 shares, and Gunter M. Turner, one share. On August 6, 1914, Julia A. Turner surrendered her certificate of Eureka stock and caused two new certificates to be issued, each for 1,998 shares, one to Fred E. Turner individually and one to him as trustee for Mrs. Kirkwood, and delivered both certificates to Fred E. Turner.

Julia A. Turner died April 9, 1915, and Fred E. Turner was appointed administrator of her estate.

At the expiration of the sixty day period stipulated in the contract of pledge, the bank commenced a suit against the Homestead Company, the Eureka Company, Fred E. Turner, Gunter M. Turner, J. M. Givens, Geo. W. Stoutz, R. W. Stoutz, Thomas A. Bell, Fred E. Turner as administrator of Julia A. Turner, deceased, Effie T. Kirkwood and Clarence W. Turner in the United States District Court for the Eastern District of Oklahoma to foreclose such mortgage and pledge, and to obtain a judgment against Fred E. Turner, individually and as administrator of the Turner estate, for the conversion of 3,996 shares of the Eureka Company stock paid as a dividend to Julia A. Turner. This suit resulted in a judgment and decree for a foreclosure of the mortgage and the pledge, and for a money judgment against Fred E. Turner, individually and as administrator of the Turner estate, for $135,-724.14 with interest from August 4, 1914, at 6% per annum, amounting in the aggregate to $157,982.89, on account of the conversion of the stock of the Eureka Company paid to Julia A. Turner as a dividend. This decree was dated April 28, 1917. Clarence W. Turner's indebtedness to the bank on that date amounted to $298,596.58.

On October 10, 1917, Fred E. Turner and the bank entered into a compromise agreement which provided that he should pay the bank $220,000, as follows: $18,560 by securities of Clarence W. Turner held by the bank, $112,440 in cash and $89,000 in deferred payments of not less than $1,000 per month, with interest on such deferred payments at 6%; that he should secure the note evidencing the deferred payments by

a pledge of all the capital stock of the Eureka Company; and that the bank should cause the decree in the foreclosure suit to be modified by eliminating the personal judgment against Fred E. Turner and in lieu thereof requiring him to deliver to the bank the 3,996 shares of Eureka stock paid to Julia A. Turner as a dividend of the Homestead Company. It further provided that, upon the modification of the decree, the bank should cause the stock and real property pledged and mortgaged to be sold pursuant to such decree, and, unless some one at the sale bid more than certain stipulated sums therefor, the bank should buy in such stock and real property at the foreclosure sale and transfer the same to Fred E. Turner.

On November 12, 1917, the bank notified counsel of record for Mrs. Kirkwood that on November 14, 1917, it would apply to the court for modification of the decree in the foreclosure suit. On the latter date, the court entered a modified decree in the foreclosure suit as of April 28, 1917, which eliminated the money judgment against Fred E. Turner individually and as administrator, and provided that, in lieu thereof, he should deliver to the bank the 3,996 shares of Eureka stock paid to Julia A. Turner as a dividend of the Homestead Company on August 4, 1914, and all dividends declared on such Eureka stock after such date; and that such Eureka stock should be foreclosed and sold under the pledge of Julia A. Turner to the bank to satisfy the indebtedness of Clarence W. Turner.

Thereafter, the foreclosure sales under the decree were made by W. H. Clark, a commissioner appointed by the court, and were confirmed in due course. The bank purchased the stock and real property at such foreclosure sales and thereafter transferred the same to Fred E. Turner.

Fred E. Turner paid the bank the sum stipulated in the contract of compromise out of his own means, with the exception of $19,001.79 which was paid out of the accumulated dividends on stock of the Homestead and Eureka Companies in his hands as administrator. These dividends accrued after the death of Julia A. Turner and pending the foreclosure litigation, and became a part of the collateral security held by the bank.

It will be noted that the effect of the compromise agreement was to restore the 3,996 shares of Eureka stock to the Homestead Company and to exonerate Fred E. Turner, individually and as administrator,

from liability on account of the conversion thereof. It did not affect the Eureka stock paid to Fred E. Turner as a dividend.

At the time of the foreclosure sales, the Turner estate had neither the funds nor the credit with which to secure funds to redeem the mortgage on the real estate or the pledge of the stock of the Homestead Company, and the indebtedness of Clarence W. Turner to the bank exceeded the value of such stock and real estate.

Fred E. Turner did not advise Mrs. Kirkwood of such compromise agreement either before or after it had been consummated. Upon learning the facts with respect to such compromise agreement, and of the acquisition of the stock of the Homestead and Eureka Companies by Fred E. Turner, Mrs. Kirkwood commenced two actions, one against him to establish a trust in the 1,998 Eureka shares and for an accounting; and another against him and Clarence W. Turner to establish a trust in her interest in the property belonging to the Turner estate acquired by Fred E. Turner through such foreclosure sales and for an accounting. These suits were consolidated for trial. Pending the trial, Fred E. Turner dissolved the Homestead and Eureka Companies and transferred their assets to himself and Gunter M. Turner. Thereupon, the latter was made a party defendant to such suits.

The court found that Mrs. Kirkwood was the owner of a 24.975% interest in the real estate formerly owned by the Eureka Company and a 50% interest in the real estate formerly owned by the Homestead Company, which had been conveyed to Fred E. Turner and Gunter M. Turner; that, after charging Fred E. Turner with the rents and profits thereof and crediting him with the amount paid to the bank, $202,086.16 was due him on June 1, 1930, and that he was entitled to a lien on the interest of Mrs. Kirkwood in such real estate for one-half of such amount. It adjudged that if, within nine months from the date of such decree, to wit, June 26, 1930, Mrs. Kirkwood should pay into the registry of the court $101,043.08 with interest thereon at 6% from the date of such decree, then Fred E. Turner and Gunter M. Turner should forthwith execute and deliver to Mrs. Kirkwood a good and sufficient deed, with special warranties of title, conveying to her a 24.975% interest in the real estate formerly owned by the Eureka Company and a 50% interest in the real estate formerly owned by the Homestead Company. It further adjudged that, in the

event Mrs. Kirkwood failed to pay such sum within such time, the property should be sold to satisfy the lien of Fred E. Turner, and that any balance remaining after satisfying such lien should be paid into the registry of the court to be disposed of by the court.

Counsel for Mrs. Kirkwood contend that the contract of October 10, 1917, between Fred E. Turner and the bank was in substance and effect a sale by the administrator to himself of the property of the estate, and is within the prohibition of section 1305, C. O. S. 1921, which provides:

"No executor or administrator must directly or indirectly, purchase any property of the estate he represents, nor must he be interested in any sale."

The compromise agreement, in effect, provided that the bank, as the agent of Fred E. Turner, should bid in the property at the foreclosure sales. Therefore, in legal effect, Fred E. Turner was the purchaser of the stock and the real estate sold at such foreclosure sales.

Our attention has not been directed to any decision of the Supreme Court of Oklahoma passing upon the question of whether section 1305, supra, applies to a foreclosure sale. The Supreme Court of Missouri in the cases of Briant v. Jackson, 99 Mo. 585, 591, 592, 13 S. W. 91, and Dillinger v. Kelley, 84 Mo. 561, construed a similar statute of Missouri and held that it did not apply to a sale made under an order of the circuit court in a mortgage foreclosure proceeding, and that it was applicable only to probate sales. At common law, the prohibition against an administrator purchasing the property of his decedent's estate does not apply to a judicial sale made by a commissioner appointed by the court, over which sale the administrator has no control, and in connection with which he has no duties to perform. 24 C. J. p. 635, § 1591. The Oklahoma statute seems to be merely declaratory of the common law prohibition. We conclude that section 1305, supra, applies only to probate sales and has no application to the sales involved herein.

Counsel for Mrs. Kirkwood further contend that, independently of the statute, Fred E. Turner, because he was the administrator of the Turner estate and the holder of 1,998 shares of Eureka stock as trustee for Mrs. Kirkwood, occupied a fiduciary relationship with respect to the property of such estate and the Eureka Company shares held in trust by him, and, on that account, was precluded from purchasing such property at the foreclosure sales.

We will consider this contention, first, with respect to the property of the Turner estate, and, second, with respect to the 1,998 shares of Eureka stock held in trust by Fred E. Turner.

## I.

It will be noted that Fred E. Turner did not induce or procure the foreclosure. No act or omission of his brought it about. The estate did not have and could not secure the necessary funds to redeem the incumbered property from the mortgage and pledge. The indebtedness secured was in excess of the value of the property mortgaged and pledged. Fred E. Turner had no control over, and no duty to perform in connection with the foreclosure sales.

Counsel for Mrs. Kirkwood assert that, even under these circumstances, Fred E. Turner, because he was administrator of such estate, was prohibited from purchasing such property at the foreclosure sale. Martin v. Wyncoop, 12 Ind. 266, 74 Am. Dec. 209, and Fleming v. Foran, 12 Ga. 594, support such contention. These cases fail to recognize the important distinction between an administrator's sale over which the administrator has control and which is conducted by him, and judicial sales over which the administrator has no control and in connection with which he has no duties to perform, such as a mortgage foreclosure sale.

Martin v. Wyncoop, supra, is bottomed upon Campbell v. Johnston, 1 Sandf. Ch. (N. Y.) 148. The latter case is clearly distinguishable from the case at bar. There the executors, having funds with which to pay the interest on the mortgage, failed to do so and by their omission induced the foreclosure. The court held that an executor could not be a purchaser at a foreclosure sale brought about by the neglect of his duties as such fiduciary.

In Allen v. Gillette, 127 U. S. 589, at page 596, 8 S. Ct. 1331, 1334, 32 L. Ed. 271, the court said:

"The principle that a trustee may purchase the trust property at a judicial sale brought about by a third party, which he had taken no part in procuring, and over which he could not have had control, is upheld by numerous decisions of this court and of other courts of this country."

In Starkweather v. Jenner, 216 U. S. 524, at page 528, 30 S. Ct. 382, 384, 54 L. Ed. 602, 17 Ann. Cas. 1167, the court said:

"Even a trustee has been held competent to purchase the trust property at a judicial sale which he has no interest in, nor [had] any part in bringing about, and which sale he in no way controls."

In Steinbeck v. Bon Homme Mining Co. (C. C. A. 8) 152 F. 333, at page 339, the court said:

"On the other hand, there is an exception to the general rule that one who occupies a fiduciary relation may not lawfully purchase the property of his' correlate for his own benefit, as well established as the rule itself. It is that an agent or trustee may lawfully buy the property of his principal or cestui que trust at a judicial sale caused by a third party which he has no part in procuring, and over which he can exercise no control."

In Prevost v. Gratz, Fed. Cas. No. 11,406, the court said:

"I know of no principle of equity which will invalidate the title of a trustee to land, which the law has taken out of his hands, and which he purchased from one appointed by the same authority to sell it."

In Chorpenning's Appeal, 32 Pa. 315, 72 Am. Dec. 789, the court said:

"The appellee was entirely powerless in his capacity of guardian in relation to the land. He had neither money nor influence as such. It may be conceded, that he stood very near the line of disability as a purchaser for his own interest, but still outside of it, if the reason of the law is to govern. Authority, however, sustains his position."

The question was exhaustively considered in Brown v. McGraw, 98 W. Va. 607, 128 S. E. 124, 127, where the court said:

"There can be no question but that, as a general rule, one occupying a fiduciary relation cannot purchase and hold for his own benefit, as against the claims of his beneficiary, property sold by him, or under his direction and control as such fiduciary, and that such a purchase is voidable at the option of the beneficiary. Newcomb v. Brooks, 16 W. Va. 32; Ayers v. Blair, 26 W. Va. 558; Winans v. Winans, 22 W. Va. 678. The appellants while recognizing this general rule, contend that where the sale of the trust property is made pursuant to a decree of the court by a special commissioner or other agent appointed by the court, the fiduciary has the right and privilege of purchasing. The appellees, on the other hand, maintain that there is no such exception or qualification of the general rule. While it cannot be said that the courts are in complete accord in recognizing this exception, there is substantial authority to the effect that it is well founded. In fact, the decisions holding that a fiduciary may purchase at a sale made by court decree and not by him, without fraud or fault on his part, but in good faith, are almost as numerous as those which hold that he has no right to purchase where he conducts the sale. 11 Am. & Eng. Ency. Law, p. 1067; 24 C. J. 635; and case cited infra. An examination of a number of cases holding contra reveals the fact that they were, for the most part, jurisdictions in which the administrator himself is given the power of sale by order of the court, and so he was in reality both buyer and seller, there being in such cases a clear conflict of interests."

See, also, Barber v. Bowen, 47 Minn. 118, 49 N. W. 684; Eckrote v. Myers, 41 Iowa, 324; Fisk v. Sarber, 6 Watts & S. (Pa.) 18; 26 R. C. L. p. 1327, § 190; 24 C. J. p. 635, § 1591.

However, in order to avoid a purchase of the property of his correlate by one who occupies a fiduciary relation, it is not necessary to show a breach of duty resulting in actual injury to the correlate. The law recognizes the infallible truth of that divine saying, "No man can serve two masters," and requires that a fiduciary refrain from voluntarily placing himself in a position where his duty as fiduciary·and his private interests conflict. So, the test is not whether the correlate has suffered an injury but whether there has been a clash between the personal interests and the duties of the fiduciary. Hoyt v. Latham, 143 U. S. 553, 566, 12 S. Ct. 568, 36 L. Ed. 259; Michoud v. Girod, 4 How. 503, 11 L. Ed. 1076; Wormley v. Wormley, 8 Wheat. 421, 441, 5 L. Ed. 651; Bennett v. Weber, 323 Ill. 283, 154 N. E. 105; Rittenhouse v. Smith, 255 Ill. 493, 99 N. E. 657; Miller v. Rich, 204 Ill. 444, 68 N. E. 488; Shute v. Austin, 120 N. C. 440, 27 S. E. 90; Stewart v. Baldwin, 86 Wash. 63, 149 P. 662; 24 C. J. p. 635, § 1590; 39 Cyc. 366; Roger v. Whitham, 56 Wash. 190, 105 P. 628, 629, 134 Am. St. Rep. 1105, 21 Ann. Cas. 272; West v. Waddill, 33 Ark. 575, 587; Jansen v. Williams, 36 Neb. 869, 55 N. W. 279, 20 L. R. A. 207; Tisdale v. Tisdale, 2 Sneed (34 Tenn.) 596, 64 Am. Dec. 775; People v. Township Board, 11 Mich. 222.

In the last cited case, the court said:

"So careful is the law in guarding against the abuse of fiduciary relations, that it will

not permit an agent to act for himself and his principal in the same transaction, as to buy of himself, as agent, the property of his principal, or the like. All such transactions are void, as it respects his principal, unless ratified by him with a full knowledge of all the circumstances. To repudiate them he need not show himself damnified. Whether he has been or not is immaterial. Actual injury is not the principle the law proceeds on in holding such transactions void. Fidelity in the agent is what is aimed at, and as a means of securing it, the law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal."

But the rule does not apply to cases where the reason for the rule, to wit, a conflict between the personal interests and the fiduciary duties of the trustee, is absent.

It is true, in the instant case, that Fred E. Turner as such administrator held the legal title to the Homestead shares and the real property of the Turner estate pledged and mortgaged to the bank, but, at the time of the foreclosure sales, such property had passed from the jurisdiction of the probate court and from the control of the administrator, and was under the jurisdiction of the United States District Court in the foreclosure proceeding. No act or omission of the administrator brought about the foreclosure sales. As such administrator, he was powerless to prevent the foreclosure proceeding and the sales thereunder. He had no control over such sales and he had no duties to perform in connection therewith. By becoming the purchaser of such property at the foreclosure sales, he did not place himself in a position where his duties as administrator conflicted with his personal interests as purchaser.

We conclude, therefore, that Fred E. Turner had a right to purchase such property at the foreclosure sales.

## II.

The original decree in the foreclosure suit in no wise affected the rights and title of Mrs. Kirkwood to the 1,998 shares of Eureka stock held by Fred E. Turner as trustee. The bank originally sought no relief against Mrs. Kirkwood with respect to such stock. Instead, it sought and obtained a judgment against Fred E. Turner, personally and as administrator, on account of the conversion of the Eureka stock paid to Julia A. Turner as a dividend.

Without the knowledge or consent of his correlate, Fred E. Turner entered into a compromise agreement with the bank which provided that the decree in the foreclosure suit should be modified so that the 3,996 shares of Eureka stock, paid to Julia A. Turner as a dividend (which included the 1,998 shares held by Fred E. Turner as such trustee), should be delivered to the bank and subjected to its lien, and that the money judgment against him, personally and as such administrator, should be eliminated. It further provided for the foreclosure and sale of such shares, the purchase thereof by the bank, and the transfer thereof by the bank to Fred E. Turner.

As a result of such compromise agreement and the modified decree made in pursuance thereof, Mrs. Kirkwood lost title to such shares and the title thereto passed through the bank to Fred E. Turner. It is clear that Fred E. Turner, by entering into such compromise agreement, used the trust property for his personal benefit and advantage, and thereby violated his trust.

Counsel for Fred E. Turner contend that, notwithstanding the fact that the bank waived its right to enforce its lien against the 3,996 shares of Eureka stock, transferred to Julia A. Turner, and elected to hold Fred E. Turner and Julia A. Turner for the conversion thereof, the bank retained a lien upon such shares until the judgment in conversion was satisfied; and cites in support thereof Union Pacific R. Co. v. Schiff (C. C.) 78 F. 216; Lovejoy v. Murray, 3 Wall. 1, 16, 18 L. Ed. 129, and 38 Cyc. 2112. But the bank asserted no such lien in the foreclosure suit and the original decree in such suit established no lien against the 1,998 shares of Eureka stock held by Fred E. Turner as trustee.

One of several wrongdoers, who has been compelled to pay the damages for the wrong committed, cannot, as a general rule, enforce contribution from the others who participated in the commission of the wrong. Sparrow v. Bromage, 83 Conn. 27; 74 A. 1070, 27 L. R. A. (N. S.) 209, 212, 213, 19 Ann. Cas. 796; Union Stock Yards Co. v. Chicago, B. & Q. R. Co., 196 U. S. 217, 224–228, 25 S. Ct. 226, 49 L. Ed. 453, 2 Ann. Cas. 525; Goldsmith v. Koopman (C. C. A. 2) 152 F. 173, 177; The Hudson (D. C. N. Y.) 15 F. 162, 167; Boyd v. Gill (C. C. N. Y.) 19 F. 145, 146; Adams v. White Bus Line, 184 Cal. 710, 195 P. 389, 390; Seattle v. Peterson & Co., 99 Wash. 533, 170 P. 140; Fakes v. Price, 18 Okl. 413, 89 P. 1123; 13 C. J. p. 828, § 18; 6 R. C. L. p. 1054, § 17;

Pomeroy's Equitable Remedies (2d Ed.) vol. 5, § 2339, p. 5173. Where, however, the act is not necessarily nor ordinarily unlawful, one who has acted without moral guilt or wrongful intent and has paid the damages caused thereby, may recover contribution from the other wrongdoer. Farwell v. Becker, 129 Ill. 261, 21 N. E. 792, 6 L. R. A. 400, 16 Am. St. Rep. 267; Vandiver v. Pollak, 107 Ala. 547, 19 So. 180, 54 Am. St. Rep. 118; Horrabin v. Des Moines, 198 Iowa, 549, 199 N. W. 988, 38 A. L. R. 554; Union Stock Yards Co. v. Railway Co., supra; Pomeroy's Equitable Remedies (2d Ed.) vol. 5, § 2339, p. 5173; 13 C. J. p. 829, § 20.

In the instant case, Fred E. Turner and Julia A. Turner, in paying the dividend of Eureka stock to the latter, were guilty of an unlawful conversion and of a fraud against the bank. Their act, therefore, comes within the general rule rather than the exception, with respect to the right of contribution between joint tort feasors.

If Fred E. Turner had paid the money judgment awarded against him by the original decree in the foreclosure suit, he could not have enforced contribution or secured indemnity from the Turner estate, or from Mrs. Kirkwood as to the shares transferred to her by Julia A. Turner. Such being the situation and relation of the parties, it follows that the fact the bank had a lien upon the trust property was no justification for Fred E. Turner inducing the bank to assert such lien to the detriment of his cestui que trust in order to avoid the personal judgment against him.

The shares held in trust by Fred E. Turner passed to the bank and from the bank back to him. He and the other stockholders transferred the property of the Eureka Company to Fred E. Turner and Gunter M. Turner. The trust property was thus converted into such real estate and is now held by the two last mentioned persons. Neither of them was a bona fide purchaser for a valuable consideration without notice of the trust.

A cestui que trust may pursue and recover trust property conveyed or transferred by the trustee otherwise than in the course of executing and carrying into effect the terms of the trust, provided its identity has not been lost and it has not passed into the hands of a bona fide purchaser for a valuable consideration without notice. United States v. Dunn, 268 U. S. 121, 132, 133, 45 S. Ct. 451, 69 L. Ed. 876; Oliver v. Piatt,

3 How. (44 U. S.) 378, 11 L. Ed. 622; Cook v. Tullis, 18 Wall. 332, 341, 342, 21 L. Ed. 933; Hynds v. Hynds, 274 Mo. 123, 202 S. W. 387, 390; Pomeroy's Equity Jurisprudence (4th Ed.) vol. 3, §§ 1048, 1052, 1058, 1080; 26 R. C. L. p. 1348, § 214.

Whenever property in its original state and form has once been impressed with the character of a trust, no subsequent change of such state and form can divest it of its trust character so long as it is capable of clear identification, and the cestui que trust may pursue and reclaim it in whatever form he may find it, unless it has passed into the possession of a bona fide purchaser for value without notice. United States v. Dunn, supra; Oliver v. Piatt, supra; Cook v. Fullis, supra; Merritt Oil Corp. v. Young (C. C. A. 10) 43 F. (2d) 27, 31; Pomeroy's Jurisprudence (4th Ed.) vol. 3, §§ 1048, 1058, 1080; 26 R. C. L. p. 1348, § 214.

Even where the property has passed into the hands of an innocent purchaser for value, the wrongdoer may not reacquire it from such purchaser free of the obligation which equity imposes upon one who despoils another of his property by breach of trust. Independent Coal & Coke Co. v. United States, 274 U. S. 640, 647, 47 S. Ct. 714, 71 L. Ed. 1270; Oliver v. Piatt, 44 U. S. (3 How.) 378, 11 L. Ed. 622.

Fred E. Turner wrongfully delivered such trust property to the bank. He reacquired it at the foreclosure sales. He caused the Eureka Company to transfer its assets to him and Gunter M. Turner. The trust property was thus converted into the real estate now held by him and Gunter M. Turner. Neither of them was a bona fide purchaser for value without notice of the trust. It follows that Mrs. Kirkwood is entitled to recover from Fred E. Turner and Gunter M. Turner 24.975 per cent. of the real estate conveyed by the Eureka Company to Fred E. Turner and Gunter M. Turner, and to have an accounting for the rents and profits thereof, less a reasonable allowance for the care, custody and management of the trust property.

The decree is reversed and the cause remanded for further proceedings in accordance with this opinion.

The costs of this appeal will be assessed equally between appellants and appellee.

On Petition for Rehearing.

Appellants have filed an extended petition for rehearing, predicated entirely upon the hypothesis that this court found that the

stock of the Eureka Realty Company was never subject to the pledge to the National Bank of Commerce in St. Louis. This court did not so hold. On the contrary, it is stated in the opinion that "the bank had a lien upon the trust property," but that such fact "was no justification for Fred E. Turner inducing the bank to assert such lien to the detriment of his cestui que trust in order to avoid the personal judgment against him."

In its bill of complaint, the St. Louis bank prayed specifically for a decree of foreclosure as to the stock of the Old Homestead Company and as to certain real estate. No foreclosure was sought as to the Eureka Company stock, but a personal judgment was prayed against Fred E. Turner and others for the conversion thereof. A decree and judgment as prayed for were rendered. On October 10, 1917, Fred E. Turner found himself in this position: A personal judgment had been rendered against him for $157,982.89. He was financially responsible. 1,998 shares of the stock of the Eureka Company had been issued to him in trust for his sister. If he paid this judgment, or if it were collected on execution, his sister's stock would be free from the lien of the bank. What Turner did was to apply his sister's stock to the satisfaction of the personal judgment against him. He thereby violated his trust.

The petition for rehearing is denied.