# A. J. HYNDS et al., Appellants, v. GEORGE HYNDS.

## Division One, April 8, 1918.

1. **LIMITATIONS: Acknowledgment of Ownership.** A frequent state-
   ment by a mother that her homestead, on which she and her son
   had resided from his infancy until he was forty years of age,
   that the land belonged to him, without any act or declaration on
   his part to indicate any connection between this continued acknowl-
   edgment and his position on the land, is not sufficient to estab-
   lish, after her death, ownership or title by limitations, since there
   was nothing in the nature of the possession of either inconsistent
   with the possession of the other.

2. ————: **Cotenancy.** To bar the other children by adverse posses-
   sion to land occupied by their mother and a son as a homestead,
   the son must establish such an unequivocal change in his con-
   duct after her death as to constitute notice of a severance of the
   possessory relation of tenants in common, and actual possession for
   ten years thereafter. For such son to simply remain on the land
   after his mother's death, and continue to work it as he had done,
   with his brother, during her life, and receive, without objection,
   the profits, with the brother while he lived and by himself after
   the brother's death, is not sufficient to give notice of a claim ad-
   verse to the other children.

3. **EJECTMENT: Equitable Answer.** If the answer sets up a purely
   equitable defense to plaintiff's action of ejectment (which is an
   action at law), the cause is converted into a suit in equity, and
   the appellate court will examine and weigh the evidence and de-
   termine its sufficiency to sustain the defense pleaded.

4. **RESULTING TRUST: Guardian and Curator.** When a trustee pur-
   chases property with trust funds and takes the title in his own
   name a trust results for the benefit of the trust estate, which may
   be followed in favor of persons not named in the deed in proportion
   to the amount of the interest of each in the fund, and the rule
   applies to executors, administrators and guardians of minors, who
   invest estate funds in lands and take the title in their own names
   or in the names of some of the beneficiaries.

5. **WIDOW: Interest in Husband's Personalty: No Exercise of Option.**
   Where under the statute the widow was entitled absolutely to a
   share in her husband's personal estate equal to a share of a child,
   or at her option to one-third of it absolutely, subject in either
   case to the payment of his debts, it will be assumed, in the ab-
   sence of anything in the record to indicate that she exercised

her option, that she was satisfied with the share of a child, although there were six children.

6. ———: **Resulting Trust: Purchase of Lands With Estate Funds.** The administratrix, by her appointment, became a trustee of the entire personal estate, and if instead of distributing it she invested it in lands, causing some of them to be conveyed to intestate's children and taking the title to one tract in her own name, such lands, for purposes of distribution, were a part of the trust fund.

7. ———: ———: ———: **Equal Distribution.** And if all the children received lands and other property, equal in value to their respective shares of their father's estate, except the youngest, who received nothing, and the mother took title to one tract in her own name, whose value was equal to that of the others, a decree vesting the title to this one tract in said youngest son, upon the mother's death, according to her frequently expressed intention, does equity.

8. **EJECTMENT: Heirs Bound by Acts and Declarations of Ancestor.** After the death of the widow leaving the youngest son in possession, all the other heirs of herself and husband brought this suit against him, in ejectment, to recover their undivided interest in the land as heirs of their mother. *Held,* that the plaintiff's are bound by the acts and declarations of the mother with respect to the trust and character of her possession, to the same extent that she, if living and a party, would be bound upon a trial of the same issue.

9. **INFANT: Charged with Childhood Expenses.** Where the father died when defendant was two years old, and his mother, the administratrix, distributed the father's personal estate by buying farms for the adult children and one for herself, upon which she and defendant remained until her death, he is not, in determining whether he received his distributive share of the estate, to be charged with his nurture during infancy, where he received little education and worked faithfully on the mother's said homestead.

Appeal from Macon Circuit Court.—*Hon. Nat M. Shelton,* Judge.

AFFIRMED.

*J. M. McCall, P. J. Reiger* and *Joseph Park* for appellants.

(1) Parol testimony to impress upon the clear legal title an implied trust, in order to accomplish such an

object and secure such an end, must be clear, strong and unequivocal, so degnite and positive as to leave no reasonable doubt in the mind of the chancellor as to the existence of such trust. Allen v. Logan, 96 Mo. 591; McFarland v. LaForce, 119 Mo. 590; Adams v. Burns, 96 Mo. 361; King v. Isley, 116 Mo. 155; R. S. 1855, sec. 4, 669. (2) A resulting trust can only arise where the person claiming the benefit of the trust has furnished the consideration money. The payment of the consideration money is the foundation of the trust; that is, the trust arises out of the circumstance that the money of the real purchaser, and not of the grantee in the deed, paid for the land. Shaw v. Shaw, 86 Mo. 594; Johnson v. Quarrels, 46 Mo. 423; Ringo v. Richardson, 53 Mo. 385. (3) Do not all the known facts, coupled with the Dower law as it stood at the date of her husband's death, raise a reasonable doubt? If she was entitled by law to one-third of her deceased husband's estate at the time of her husband's death, in the absence of conclusive evidence that she waived it, is not the presumption conclusive that she took it? Especially so, in view of the irresistible mathematical calculation based on the record that a child's share was $558.74. The record shows that there were six children when she accounted for $2234.96, which was four-sixths. The whole estate going to the children would therefore be $3352.44. If she took her third then $3352.44 is two-thirds of the whole estate and one-third of her share was $1676.22, and the whole estate was evidently of the value of $5028.66. The consideration she paid for all the land she bought and kept to the date of her death was $1650.

*Campbell & Ellison* and *Higbee & Mills* for respondent.

(1) It is conclusively shown by the evidence of plaintiffs and defendant that at the time of the death of John Hynds, his widow, Permelia Hynds owned no property. That all of the property transferred to their

children was purchased with the trust funds which came into the hands of the widow while she was acting as administratrix and guardian. That many years ago she had settled with each of her children by segregating the interests of each in said estate, and setting apart to them their respective interests. That after the settlements with those children there remained in the estate only the lands involved in this controversy. It is conclusively shown, in fact admitted, that the defendant, George Hynds, never received anything from the estate except the lands involved in this controversy. (2) It is well settled law in this State when a guardian, curator, or administrator purchases property with trust funds, a trust results in favor of the ward or beneficiary. Patterson v. Booth, 105 Mo. 405; May v. May, 189 Mo. 485; In re Ferguson estate, 124 Mo. 574. The conceded fact that Permelia Hynds owned no property at the time of her husband's death and that she afterwards acquired title in her own name to various tracts of land, is in itself sufficient evidence to show that the lands were brought with trust funds. Prewitt v. Prewitt, 188 Mo. 675. (3) Plaintiffs insist, however, that the 80 was bought by Mrs. Permelia Hynds with her individual money. If that be true it was not clothed with a trust and she could give it to her son George, as she did when he attained his majority. The failure to execute a deed will not defeat her purpose. Equity regards that as done which was intended to be done. Besides, the evidence shows that Mrs. Hynds and all her children dealt loosely with each other. (4) On the first trial the court found that the 80 acres belonged to George Hynds but that the other two tracts belonged to plaintiffs and defendant, ordered them sold and the proceeds distributed. By stipulation it is agreed that at the instance of the plaintiffs this was done, and the proceeds divided. Plaintiffs took the fruits of that judgment and are concluded by it. If the trial court took that view of the case, absent declarations of law, it cannot be reviewed. 2 Cyc. 651, e.

BROWN, C.—This is ejectment begun in the Adair Circuit Court in March, 1909, to recover three tracts of land in that county. The first and largest of these tracts is described as follows: The south half of the southwest quarter of Section 12 of Township 61 of Range 15 except the right of way of the Wabash Railroad. It is not necessary to describe the two smaller tracts.

The petition was in the ordinary form, alleging that plaintiffs were entitled to possession on October 4, 1899, and the ouster on May 18, 1908.

The answer was (1) a general denial; (2) a prayer that the court ascertain and adjudge the right, title and interest of the parties plaintiffs and defendant respectively, and to adjudge the defendant to be the absolute owner; (3) that his father, John Hynds, died in June, 1858, leaving his widow, Permelia Hynds and their children W. G. Hynds, A. J. Hynds, Richie Hynds, Jennie Mahaffy and defendant as his only heirs; that his mother took letters of administration of the estate, consisting of money, notes and other personal property, out of which she purchased the land in controversy; that afterward she settled with each of the other heirs, paying them in full their respective shares, after which there only remained these lands, which did not exceed his distributive share of the estate, and which she promised to convey to him, and which he accepted as his distributive share of the estate of his father, and took possession of the same, and that for more than ten years before the death of his mother and up to the time of the beginning of the suit had remained in actual and continuous possession, claiming title thereto.

The affirmative matters so pleaded were put in issue by the reply, which alleged that from the time of the death of her husband, his mother had furnished the defendant with food, clothing and shelter, by which all his interest in his father's estate had been consumed.

The cause came on for trial in the Adair Circuit Court, and resulted in a judgment vesting the entire

title to the eighty-acre tract we have described, in the defendant, to the exclusion of plaintiffs and each of them, and declaring the title in fee to the two smaller tracts to be in the plaintiffs and defendant according to their respective interests as heirs of Permelia Hynds.

From this judgment an appeal was taken to this court, in which it was reversed in so far as it was in favor of defendant as to his full ownership of the eighty-acre tract, and remanded for a new trial upon that issue, which is all that is left in the case. Upon the going down of our mandate a change of venue was taken to the circuit court for Macon County, where a new trial was had; resulting in the judgment from which this appeal is taken. It adjudges the title to the eighty acres to be in defendant free from all claims of plaintiffs or either of them.

Although the title of the cause is not mentioned, there is enough information scattered through the appellant's abstract of the record to justify the inference that the plaintiffs include all the living children of John and Permelia Hynds excepting defendant, together with the living children of William G. Hynds, a son, who died in March, 1899. The defendant is their youngest son. John Hynds died in Adair County in June, 1858, leaving surviving him the said Permelia, his widow, and six children, to-wit, W. G. Hynds (since deceased as above stated), A. J. Hynds, Richie Hynds, Jennie Mahaffy, Mary Hynds and George Hynds, the defendant. Richie died about two years before the institution of this suit, childless and unmarried. Mary died at sometime not stated in the evidence. Permelia Hynds died in 1898, seized in fee simple of the eighty acres of land in controversy. At the time of the death of Mr. Hynds, the defendant, his youngest child, was but two years old. Nothing is said about Mrs. Mahaffy's husband, so that we may assume that she is a widow.

Immediately after the death of Mr. Hynds his widow took out letters of administration and filed an inventory of his estate, which consisted entirely of

Hynds v. Hynds.

personal property, mostly cash and notes, and amounting
in all to $5452.91.  She had no property of her own
other than her interest in this estate.  The inventory
was dated and filed August 11, 1858.

September 21, 1858, Mrs. Hynds purchased the west
forty acres of the land in controversy, taking title in
her own name and paying $750 therefor.  On the same
date she purchased the two small tracts of timber land
originally involved in this suit for $225, taking the title
in her own name, and April 27, 1864, she obtained the
other forty now involved in this suit, taking the title
to herself.

On May 6, 1865, she made a statement as guardian
of the persons and estates of "the minor heirs of John
Hynds, deceased," in which she reported that she made
final settlement as administratrix of his estate at the
April term, 1863, of the probate court, at which she
paid W. G. Hynds, one of the heirs, $450, and that
there was in her hands at that time belonging to the
minors $3343.39.  This statement showed a balance still
in her hands of $2234.96, with which she accordingly
charged herself as of that date.  On the next day after
this statement, she gave bond as guardian in the sum
of $5000, which was duly approved.  The receipt of W.
G. Hynds for $450 is dated August 7, 1863.  On
August 9, 1880, the following entry appears: "Estate
of Hynds, minor heirs, Permelia Hynds, G. & C.,
annual settlement filed."  And on the same date the
following:  "Estate of Jennie Mahaffy, Permelia
Hynds, G. & C., final settlement filed and continued."
All other records of the probate court tending to throw
light on this case seem to have been lost or destroyed.

On August 8, 1863, Mrs. Permelia Hynds conveyed
to William G. Hynds eighty acres of land in Adair
County for the expressed consideration of $150.

On August 31, 1866, one William Kirby and wife
conveyed to Richie Hynds seventy acres of land in
Adair County for $1400.

274 Sup.—9

On December 18, 1868, she conveyed to A. J. Hynds two lots in Kirksville for $800.

Doctor A. J. Hynds, one of the plaintiffs, testified very fully and frankly of his own connection with the estate of his father and the circumstances of the purchase from Kirby of the seventy acres of land conveyed to Richie. He himself according to his testimony received a considerable amount from the estate expended upon his professional education, as well as the Kirksville lots, and he does not intimate that the amount so received was not as much as his full share of his father's estate. That W. G. Hynds, the oldest of the children, received eighty acres of land as valuable as that now in controversy is not questioned. The evidence also shows that in the purchase of the Kirby land Richie was as well taken care of as his older brother. It is also freely admitted that George never received anything from the estate of his father, unless his nurture during infancy by his mother should be charged to him. He received no costly education and, from the time he was big enough, worked on the farm in controversy, contributing in that way to his mother's support. As to Mrs. Mahaffy she seems to have received a good education, both literary and musical, and a piano, the value of which is not stated.

At the time of the death of her husband Mrs. Permelia Hynds resided in Millard, but afterward went to live on the land in controversy with her family, including her two sons Richie and George, both of whom remained unmarried. After George became old enough the boys worked it. Until the mother's death the place remained the family homestead. In 1908, Richie died, and George continued to live there and worked the land up to the time of the trial. Richie, at the time of his death, devised his seventy acres to George. This, as stated by one of the witnesses, created some dissatisfaction in the family. To use the words of the witness, it made them sore.

There was much evidence to the effect that Mrs. Hynds had stated frequently that this land belonged to George; that all the others had received from her their share in the estate of their father and that George had received nothing; and there was evidence to the effect that she had urged him to take her to a conveyancer to make a deed, but that he had been "dilatory" and had not done it. While the plaintiffs proved that George and his brother Richie, when they went to town, used frequently to come home under the influence of intoxicants, and that Mrs. Hynds would sometimes get "cranky," there was no question as to the industry and ability of both, and the farm was kept in good condition.

I. There seems to be an element in human nature which might with propriety be called the family sentiment, out of which much litigation has vexed the courts. It resents favoritism among relatives of the same degree of consanguinity, and sometimes sets the most affectionate families by the ears. In this case the very best of feeling seemed to prevail in the Hynds family for many years. The death of the mother, who seems from the evidence to have been a woman of strong character and excellent business judgment, did not disturb or change their relations to each other, and the defendant continued, during the succeeding eight years in the unquestioned possession of this land, farming it in connection with his partner as before, without a word of protest or a call to account for his stewardship, until the death of Richie. While the appellants account for this in their testimony by the statement, in substance, that it was a small matter which did not, in their estimation, justify the stirring up of any disagreeable feeling in the family, it is impossible to avoid the inference that the act of Richie in leaving his nice little farm to his partner brother instead of dividing it among all, had something to do with the suppression of these senti-

*Family Sentiment.*

ments.   They are now here in pursuit of their legal rights, which it has thus become our duty to determine. It is gratifying, under these circumstances, to find little in the record to indicate that their statements have been colored by self-interest or personal feeling.

II.   We find little in the record to support the theory that the plaintiffs are barred of their possessory action by the Statutes of Limitation.   The legal title of the mother constitutes the very foundation of the plaintiffs' claim.  The defendant relies upon her continued acknowledgment of the character of his right, but has shown no act or declaration of his own to indicate any connection between that claim and his position upon the land.   They were both there, and we can see nothing in the nature of the possession of either inconsistent with the interest of the other as asserted in this suit.   The possession of the defendant is not shown to have been exclusive of or adverse to the ancestor of plaintiffs during her life.   Nor do we think that the evidence discloses such an unequivocal change in the conduct of defendant after the death of his mother and more than ten years before the institution of his suit, as the law requires to constitute notice of a severance of the possessory relation of tenants in common and of a claim adverse to the true title.   It would be a dangerous rule which would permit the title of the owner to be divested by any other than the most overt acts brought home to him so clearly that he cannot in reason close his eyes and ears against them.   The burden is upon the defendant to fix the time when he began to hold adversely to the true title. [Missouri Lumber & Mining Company v. Jewell, 200 Mo. 707, 716; Hunnewell v. Adams, 153 Mo. 440; McCune v. Goodwillie, 204 Mo. 306, 339, and cases cited.] There can be nothing clandestine or stealthy about adverse possession.   [Meier v. Meier, 105 Mo. 411, 431.]   As we have said in this case (Hynds v. Hynds, 253 Mo. 20, 33) "to establish such possession in favor of one

<strong>Limitations.</strong>

cotenant, as against another, there must be such outward acts of exclusive ownership as to impart notice of adverse possession to other cotenants;" and that "the acts relied on, whether verbal or otherwise, must be open, clear and so unequivocal as to coerce belief." That is still the law in this case.

III. We now come to the real question which divides the parties to this cause and for the trial of which alone it was remanded to the Adair Circuit Court in a former hearing by the court. The defense stands upon the theory that upon the purchase of this land **Equitable Answer.** by Mrs. Hynds a trust resulted to the estate of her deceased husband of which she was the administratrix and out of the funds of which it was paid for, and that the defendant is now the sole beneficiary of that trust and is consequently the equitable owner of the land and entitled to relief as suggested. The proceeding is ejectment, and as such is an action at law as distinquished from a suit in equity. Its object is to try the right to the possession of the land, and to enforce that right by an appropriate judgment. The Code (R. S. 1909, sec. 1806) provides that the answer shall contain "a statement of any new matter constituting a defense or counterclaim," and "may set forth . . . as many defenses and counterclaims as he may have, whether they be such as have been heretofore denominated legal or equitable, or both." [Id., sec. 1807.] These provisions are the fruit of the statute providing that in this State there shall be but one form of action.

This defense is, within the meaning of the provisions we have quoted, a purely equitable one, and under the practice as it existed before the Code, required an equitable remedy. Its object is to establish a trust in lands, and to afford a complete and appropriate remedy to the equitable owner. A judgment for the defendant in ejectment on that issue would necessarily afford him complete equitable relief and would constitute a

complete adjudication of the equitable issue involved. [Chouteau v. Gibson, 76 Mo. 38.] The testimony necessary to support it would have to be judged by those equitable rules established for the purpose of protecting legal rights and not by the ordinary rules applicable to the trial of actions at law. While we make these observations for the purpose of directing attention to the fact that we have considered the questions relating to the form of trial adopted in the circuit court and the consequent credit to which its findings upon questions of fact is entitled, we do not consider such questions important in this case in view of the conclusion at which we have arrived. We will therefore treat the issue as an equitable one, triable by the court, and examine the weight and sufficiency of the evidence accordingly.

IV. Both parties agree that when a trustee purchases property with trust funds and takes the title in his own name a trust results for the benefit of the trust estate, and that this may be followed in favor of persons not named in the deed in proportion to the amount invested by each. [In re Ferguson's Estate, 124 Mo. 574; Patterson v. Booth, 103 Mo. 402; Hynds v. Hynds, 253 Mo. 20; Freeman v. Maxwell, 262 Mo. 13, 21.] That this rule applies to executors, administrators and guardians of minors, as well as to other trustees, goes without saying. We have only to apply these facts to this simple and salutary principle to arrive at a correct solution of this case. Although the record is not as instructive as we could wish, nor as it should be, there is little difficulty in arriving at a satisfactory result.

**Trust Funds.**

Mr. Hynds died in June, 1858. Although he had no land he had horses, wagons, cows and other property which indicated that farming was his business and his intention. His estate consisted largely of cash and evidences of indebtedness, inventoried at $5452.91, of which his widow, who had no property of her own,

immediately took charge, having been appointed his administratrix. The law at that time provided (R. S. 1855, sec. 4, p. 669) that his widow should be entitled absolutely to a share of his personal property equal to the share of a child; or *at her option* to one-third of his personal estate absolutely, subject in either case to the payment of debts. There is nothing in the record to indicate that she exercised her statutory option, and we must therefore assume that she was satisfied to take the share of a child, of whom there were six. This defendant, the youngest, was then only two years old. By her appointment she became the trustee of the entire fund, neither she nor the children having any interest other than such as was subject to the trust, which included the payment of debts and costs, as well as the distribution of what might be left. Mrs. Hynds had no money of her own. Everything in her hands was included in the trust fund.

She seemed to have a well founded confidence in Adair County land, and immediately upon the death of her husband began to buy it with money of the estate. Among other tracts she purchased the land in controversy, which thereupon became in equity a part of the assets in her hands belonging to the estate. Each investment she made from the trust fund became a part of that fund, and its character in that respect followed it through all its subsequent transmutations. The theory suggested by the appellant that she might separate her own interest in the final distribution from the body of the fund whenever she chose to do so is without foundation in law or in fact. It may be true that the probate court might, by its order, have directed the severance of this money from the estate, subject to the rights of creditors and other distributees, but that question is not before us for determination. It is sufficient to say that the trust attached to all property in which the fund or any part of it was invested, as against any and all persons receiving the titles at the time of the purchase, or afterward with knowledge of the source

from which the purchase money had come. [See cases above cited.] It follows from this that all property purchased by Mrs. Hynds with the money of the estate in her hands was in equity the property of the estate and so continued until final distribution to those entitled. The inquiry is thus reduced to the interest of defendant in the estate of his father, of which these lands constituted a residuum, at the time of the death of his mother.

We will assume, because it is admitted by the parties, that he never received anything from the estate unless his nurture as an infant be charged against him, and there is nothing in the record to indicate the propriety of doing this. He was an infant only two years old at the time, and during the forty years succeeding the death of his father, he remained on the land with his mother. Whatever she may have done with the rest of the estate, he was entitled to his distributive share from this so long as it should remain in her hands or in the hands of her heirs. There is nothing in this meager record to indicate that he ever went to school, and much to show that he worked. It is shown by evidence apparently credible and upon which no word of suspicion has been breathed, either with respect to the character of the witnesses or the truth of their statements, that during all that time the mother freely stated, in substance, that this particular land belonged to George, because all the other children had received their share of the estate while he had received nothing. It shows without question that she had attempted to have him take her to town for the purpose of executing a deed to carry out this design, but that he had been "dilatory." All this remains undisputed, either directly or by circumstance, and is made probable by the frank admission of Doctor A. J. Hynds, the only one of the plaintiffs alive and in position to know all the facts of the transaction, that George never received anything from the estate. All of the plaintiffs are now seeking to recover the land

solely upon the ground that they inherited it from the mother. Her title is the title in question. While, had they been still interested in their father's estate, they might have proceeded in equity against this land as a part of the trust fund, they have not done so, but admit by their course that they have no such interest. In that case their remedy would have been in equity and they depend on no equitable title. As we have already said the suit is ejectment founded solely upon the title of their mother, and in which they claim no equity. They are bound as heirs by her acts and declarations tending to prove the equity of their adversary to the same extent she would be bound were she living. They have made their bed in the place of their choice and cannot now complain of the hard places in it.

Bearing in mind that while the mother was under no obligation whatever to take her share of her husband's estate, she was bound to render to defendant his full share, we must look to the record to ascertain it. At the door of this inquiry we find it interesting to inquire about the ages of the Hynds children. While this must have been a matter of notoriety we find that for the most part it is excluded from the record. There was testimony of the ages of some of them at the time they testified, but even that date is withheld, the testimony having been taken by deposition or at a former hearing. The order of their birth is given, however, as well as the fact that Doctor A. J. Hynds, the second child, and Richie, the third, enlisted in the Army of the United States in February, 1862, and served for three full years, having been discharged in the spring of 1865. We have no right to assume that there was any concealment or misstatement about their ages at the time of their enlistment, and note that we have said in this case when it was here before that they were respectively eighteen and twenty years old at the time of their enlistment and we will so assume.

The record recites that Mrs. Hynds made final settlement as administratrix of the estate of her husband

on August 7, 1863, and that on that date she paid W. J. Hynds $450. On the next day she made him a deed to eighty acres of land described in the evidence as being as valuable as the home farm now in controversy, for the expressed consideration of $150. As he must at that time have been considerably past the age of twenty-one years it would seem that this was sufficient to dispose of his interest in the estate, and the plaintiffs do not question that it amounted to his full share. A receipt for $450 is preserved in the record. Whether Mary, the fourth child, was alive or dead at that time does not appear. The balance on hand at the final settlement is stated to have been $3343.39. All this appears in a statement which she filed in the probate court May 6, 1865, and upon which she was appointed "guardian and curator of the minor heirs of John Hynds, deceased." This does not disclose the number or names of the minor heirs, nor do those facts appear anywhere in the record. It is certain, however, that both A. J. Hynds and Richie had reached their majority. If Mary was then living there were three minors. If she was dead there were but two. Whatever their number may have been the amount of their estate was $2234.96—a decrease of something more than $1100 from the amount on hand at the final settlement.

On August 31, 1886, Richie received the conveyance of the seventy acres of land near the home farm, which he devised to the defendant at his death in 1908, and on December 18, 1868, Doctor Hynds received by conveyence from his mother the lots in Kirksville, the deed reciting a consideration of $800. We have carefully examined the testimony of Doctor Hynds and have no doubt that in these transactions both he and Richie received from their mother the full amount due them from the estate of Mr. Hynds, as well as from the estate of their sister Mary. The lands were valuable, the seventy acres being worth as much as the land in controversy. While the doctor disclosed the receipt of money and notes that had belonged to his father's

estate, he is living and testified and has no fault to find with the treatment he received in this respect, and Richie evidently found no fault in his lifetime. He lived with his mother until her death. Their relations seem to have been of the pleasantest, and his relations with the defendant were such that he gave to the latter his property at his death. The mother seems to have devoted herself entirely to her children and one cannot read this record without a strong impression that had she lived this difference would not have occurred. That the defendant never received anything either from his father's estate or from the estate of his deceased sister is not denied, and that she intended this land as his share and purchased it for that purpose is shown by testimony of neighbors and friends, and even by the testimony of her other living son, so plainly that it leaves no doubt in our mind of the fact. The only doubt we have had relates to the position of Mrs. Mahaffy, but upon a thorough examination of the evidence we conclude that she was well taken care of in the final settlement which her mother filed in 1880 as her guardian, and which is not preserved. She must then have been thirty years old and capable of fully comprehending her rights; but the matter was dropped in the probate court and evidently from her own mind. We see no good ground for reviving it in her behalf after the lapse of thirty years.

We find from the evidence that the land in question was purchased by Mrs. Hynds with the money of her husband's estate; that all the other assets of the estate have been fully administered and distributed among the heirs, each one receiving the full share to which he or she was entitled, including the share which descended through the deceased daughter Mary, but that the defendant has received nothing; that the only asset of the estate remaining undistributed is the land in controversy, which amounts to no more than defendant's share, considered either independently of or with reference to the amount already distributed to the others; that

the land in controversy constitutes the entire residuum of the estate, of which he is the sole owner in equity.

The trial court having taken this view of the matter its judgment is affirmed. *Railey, C.,* concurs.

PER CURIAM:—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All of th'e judges concur; *Bond, P. J.,* in result.